# THOMPSON *v.* KEOHANE, WARDEN, ET AL.

No. 94–6615.   Argued October 11, 1995—Decided November 29, 1995

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SCALIA, KENNEDY, SOUTER, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 116.

*Julie R. O'Sullivan*, by appointment of the Court, 513 U. S. 1137, argued the cause and filed briefs for petitioner.

*Cynthia M. Hora*, Assistant Attorney General of Alaska, argued the cause for respondents. With her on the brief was *Bruce M. Botelho*, Attorney General, *pro se*.*

JUSTICE GINSBURG delivered the opinion of the Court.

During a two-hour, tape-recorded session at Alaska state trooper headquarters, petitioner Carl Thompson confessed that he killed his former wife. Thompson's confession was placed in evidence at the ensuing Alaska state-court trial,

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Florida et al. by *Robert A. Butterworth*, Attorney General of Florida, and *Carolyn J. Mosley*, Assistant Attorney General, *Grant Woods*, Attorney General of Arizona, *Daniel E. Lungren*, Attorney General of California, *Gale A. Norton*, Attorney General of Colorado, *John M. Bailey*, Chief State's Attorney of Connecticut, *M. Jane Brady*, Attorney General of Delaware, *Margery S. Bronster*, Attorney General of Hawaii, *Alan G. Lance*, Attorney General of Idaho, *Pamela Carter*, Attorney General of Indiana, *Tom Miller*, Attorney General of Iowa, *Carla J. Stovall*, Attorney General of Kansas, *Chris Gorman*, Attorney General of Kentucky, *Richard P. Ieyoub*, Attorney General of Louisiana, *Andrew Ketterer*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *Jerimiah W. "Jay" Nixon*, Attorney General of Missouri, *Joseph P. Mazurek*, Attorney General of Montana, *Don Stenberg*, Attorney General of Nebraska, *Frankie Sue Del Papa*, Attorney General of Nevada, *Jeffrey R. Howard*, Attorney General of New Hampshire, *Deborah T. Poritz*, Attorney General of New Jersey, *Dennis C. Vacco*, Attorney General of New York, *Michael F. Easley*, Attorney General of North Carolina, *Betty D. Montgomery*, Attorney General of Ohio, *Drew Edmondson*, Attorney General of Oklahoma, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Charles Molony Condon*, Attorney General of South Carolina, *Mark Barnette*, Attorney General of South Dakota, *Charles W. Burson*, Attorney General of Tennessee, *Dan Morales*, Attorney General of Texas, *Jan Graham*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *James S. Gilmore III*, Attorney General of Virginia, and *Christine O. Gregoire*, Attorney General of Washington; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*.

and he was convicted of first-degree murder. Challenging his conviction in a federal habeas corpus proceeding, Thompson maintained that the Alaska troopers gained his confession without according him the warnings *Miranda* v. *Arizona*, 384 U. S. 436 (1966), requires: that he could remain silent; that anything he said could be used against him in court; and that he was entitled to an attorney, either retained or appointed.

*Miranda* warnings are due only when a suspect interrogated by the police is "in custody." The state trial and appellate courts determined that Thompson was not "in custody" when he confessed. The statute governing federal habeas corpus proceedings, 28 U. S. C. § 2254, directs that, ordinarily, state-court fact findings "shall be presumed to be correct." § 2254(d). The question before this Court is whether the state-court determination that Thompson was not "in custody" when he confessed is a finding of fact warranting a presumption of correctness, or a matter of law calling for independent review in federal court. We hold that the issue whether a suspect is "in custody," and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact qualifying for independent review.

I

On September 10, 1986, two moose hunters discovered the body of a dead woman floating in a gravel pit lake on the outskirts of Fairbanks, Alaska. The woman had been stabbed 29 times. Notified by the hunters, the Alaska state troopers issued a press release seeking assistance in identifying the body. Thompson called the troopers on September 11 to inform them that his former wife, Dixie Thompson, fit the description in the press release and that she had been missing for about a month. Through a dental examination, the troopers conclusively established that the corpse was Dixie Thompson. On September 15, a trooper called

Thompson and asked him to come to headquarters, purportedly to identify personal items the troopers thought belonged to Dixie Thompson. It is now undisputed, however, that the trooper's primary reason for contacting Thompson was to question him about the murder.

Thompson drove to the troopers' headquarters in his pickup truck and, upon arriving, immediately identified the items as Dixie's. He remained at headquarters, however, for two more hours while two unarmed troopers continuously questioned him in a small interview room and tape-recorded the exchange. The troopers did not inform Thompson of his *Miranda* rights. Although they constantly assured Thompson he was free to leave, they also told him repeatedly that they knew he had killed his former wife. Informing Thompson that execution of a search warrant was underway at his home, and that his truck was about to be searched pursuant to another warrant, the troopers asked questions that invited a confession. App. 43–79.[1] Eventually, Thompson told the troopers he killed Dixie.

---

[1] These passages from the transcript of the tape-recorded interrogation indicate the tenor of the questioning:

"Q Do you know—of course, I don't mean to take up a lot of your time, you—you can leave any time that you want to, if you've got something else going on.

"A Oh no (indiscernible) around here, no.

"Q I know we called you and probably woke you up and. . . .

"A No, I was just laying there.

"Q Okay. But you know, you can go any time you want to. We got a—you know, we're trying to—trying to crack on this thing, and I—I don't imagine it's any secret to you that there are some of your—your friends or associates who have been kind of calling up and saying, you know, they've been pointing at you. . . .

"A Yeah, that (indiscernible) guy you know and we've been friends for ten years, you know, and this guy is starting to say stuff that I never even said. . . ." App. 44–45.

"Q . . . And I'm willing to work with you on this thing to make the best of a bad situation. I can't tell you that this isn't a bad situation. I mean

As promised, the troopers permitted Thompson to leave, but impounded his truck. Left without transportation, Thompson accepted the troopers' offer of a ride to his friend's

---

you're free to get up and walk out of here now and—and never talk to me again. But what I'm telling you now is this is probably the last chance we'll have to—for you to say something that other people are gonna believe because let's just—let's just say that there's enough (indiscernible) here already that we can—we can prove conclusively beyond a reasonable doubt that—that you were responsible for this thing—this thing. Well really there's a lot that she's responsible for, but you're the guy that's stuck with the problem. . . .

"A I've already told you the story.

"Q . . . Well you haven't told me the critical part and you haven't told me the part about where Dixie gets killed.

"A And I don't know about that. That's your guys' job. You're supposed to know that.

"Q Well like I told you, we know the who, the where, the when, the how. The thing we don't know is the why. And that's—that's the thing we've got to kind of get straight here today between you and I. See I know that you did this thing. There's—there's no question in my mind about that. I can see it. I can see it when I'm looking at you. And I know that you care about Dixie. I mean this isn't something that you wanted to happen. . . .

. . . . .

"Q . . . I think that now it's the time for you to come honest about this thing, because if you turn around later and try to. . . .

"A I am being honest about it.

"Q No, you haven't. You told part of the truth and you told a lot of it, but you haven't told all of it. . . . I mean your—you're not probably lying directly to me, but you're lying by omission . . . . I can tell you that right now there's a search warrant being served out at [your home] and a search warrant for your truck is gonna be served and we've got a forensic expert up from—from Anchorage . . . .

"A Huh.

"Q . . . And I don't believe that you're a bad person. I really don't. . . . [W]hat happened here was never planned, what happened here was one of these things that just happen. . . . And when it happened you're stuck with this—I mean you're stuck with a hell of a mess now. She's got—she's finally got you into more trouble than she can possibly imagine. I mean she's brought this thing on you. She causes that. . . . I mean I don't know whether she started the thing by grabbing the knife and saying she was

house. Some two hours later, the troopers arrested Thompson and charged him with first-degree murder.

The Alaska trial court, without holding an evidentiary hearing, denied Thompson's motion to suppress his September 15 statements. Tr. 118 (Dec. 12, 1986); Tr. 142 (Mar. 18, 1987). Deciding the motion on the papers submitted, the trial court ruled that Thompson was not "in custody" for *Miranda* purposes, therefore the troopers had no obligation to inform him of his *Miranda* rights. App. 8–9.[2] Applying an objective test to resolve the "in custody" question, the court asked whether " 'a reasonable person would feel he was not free to leave and break off police questioning.' " *Id.*, at 7 (quoting *Hunter* v. *State*, 590 P. 2d 888, 895 (Alaska 1979)). These features, the court indicated, were key: Thompson arrived at the station in response to a trooper's request; two unarmed troopers in plain clothes questioned him; Thompson was told he was free to go at any time; and he was not arrested at the conclusion of the interrogation. App. 7–8. Although the trial court held that, under the totality of the circumstances, a reasonable person would have felt free to leave, it also observed that the troopers' subsequent actions—releasing and shortly thereafter arresting Thompson—rendered the question "very close." *Id.*, at 8–9.

After a trial, at which the prosecution played the tape-recorded confession, the jury found Thompson guilty of first-degree murder and tampering with evidence. The Court of Appeals of Alaska affirmed Thompson's conviction, concluding, among other things, that the troopers had not placed Thompson "in custody," and therefore had no obligation to give him *Miranda* warnings. *Thompson* v. *State,*

---

gonna (indiscernible) at you and it got turned around or just what happened. I mean I don't know those things. . . ." *Id.*, at 49–51.

[2] The trial court also rejected Thompson's contention that his confession was involuntary. On both direct and habeas review, Thompson unsuccessfully asserted the involuntariness of his confession. His petition to this Court, however, does not present that issue.

768 P. 2d 127, 131 (Alaska App. 1989).[3] The Alaska Supreme Court denied discretionary review. App. 24.

Thompson filed a petition for a writ of habeas corpus in the United States District Court for the District of Alaska. The District Court denied the writ, according a presumption of correctness under 28 U. S. C. § 2254(d) to the state court's conclusion that, when Thompson confessed, he was not yet "in custody" for *Miranda* purposes. App. 37. The Court of Appeals for the Ninth Circuit affirmed without publishing an opinion. 34 F. 3d 1073 (1994). Based on Circuit precedent,[4] the court held that "a state court's determination that a defendant was not in custody for purposes of *Miranda* is a question of fact entitled to the presumption of correctness under 28 U. S. C. § 2254(d)." App. 41.

Federal Courts of Appeals disagree on the issue Thompson asks us to resolve: whether state-court "in custody" determinations are matters of fact entitled to a presumption of correctness under 28 U. S. C. § 2254(d), or mixed questions of law and fact warranting independent review by the federal habeas court. Compare *Feltrop* v. *Delo*, 46 F. 3d 766, 773 (CA8 1995) (applying presumption of correctness), with *Jacobs* v. *Singletary*, 952 F. 2d 1282, 1291 (CA11 1992) (conducting independent review). Because uniformity among federal courts is important on questions of this order, we granted certiorari to end the division of authority. 513 U. S.

---

[3] It is unclear in this case what deference the Alaska appellate court accorded to the trial court's conclusion that petitioner was not "in custody"; in later decisions, the Alaska Court of Appeals reviewed the trial courts' "in custody" determinations for "clear error." See *Higgins* v. *State*, 887 P. 2d 966, 971 (Alaska App. 1994); *McKillop* v. *State*, 857 P. 2d 358, 361 (Alaska App. 1993).

[4] The panel relied on *Krantz* v. *Briggs*, 983 F. 2d 961, 964 (CA9 1993), which held that state-court "in custody" determinations warrant a presumption of correctness under § 2254(d) if the state court made factfindings after a hearing on the merits.

1126 (1995). We now hold that the 28 U. S. C. §2254(d) presumption does not apply to "in custody" rulings; accordingly, we vacate the Ninth Circuit's judgment.

## II

"[I]n-custody interrogation[s]," this Court recognized in *Miranda* v. *Arizona,* place "inherently compelling pressures" on the persons interrogated. 384 U. S., at 467. To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. *Id.,* at 444. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Ibid.;* see also *Oregon* v. *Mathiason,* 429 U. S. 492, 495 (1977) *(per curiam)* (duty to give *Miranda* warnings is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody'") (quoted in *Stansbury* v. *California,* 511 U. S. 318, 322 (1994) *(per curiam)*). Our task in petitioner Thompson's case is to identify the standard governing federal habeas courts' review of state-court "in custody" determinations.[5]

## A

Section 2254 governs federal habeas corpus proceedings instituted by persons in custody pursuant to the judgment of a state court. In such proceedings, §2254(d) declares,

---

[5] Claims that state courts have incorrectly decided *Miranda* issues, as *Withrow* v. *Williams,* 507 U. S. 680 (1993), confirms, are appropriately considered in federal habeas review.

108

state-court determinations of "a factual issue" "shall be presumed to be correct" absent one of the enumerated exceptions.[6] This provision, added in a 1966 amendment, Act of

[6] Section 2254(d) lists eight exceptions to the presumption of correctness. In full, 28 U. S. C. § 2254(d) reads:

"In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

"(1) that the merits of the factual dispute were not resolved in the State court hearing;

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

"(3) that the material facts were not adequately developed at the State court hearing;

"(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

"(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding;

"(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

"And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly

Nov. 2, 1966, Pub. L. 89–711, 80 Stat. 1105–1106, received the Court's close attention in *Miller* v. *Fenton,* 474 U. S. 104 (1985). As the *Miller* Court observed, §2254(d) "was an almost verbatim codification of the standards delineated in *Townsend* v. *Sain,* 372 U. S. 293 (1963), for determining when a district court must hold an evidentiary hearing before acting on a habeas petition." *Miller,* 474 U. S., at 111.[7] *Townsend* counseled that, if the habeas petitioner has had in state court "a full and fair hearing . . . resulting in reliable findings," the federal court "ordinarily should . . . accept the facts as found" by the state tribunal. 372 U. S., at 318. Section 2254(d) essentially "elevated [the *Townsend* Court's] exhortation into a mandatory presumption of correctness." *Miller,* 474 U. S., at 111–112; see also *id.,* at 112 (emphasizing respect appropriately accorded "a coequal state judiciary" and citing *Culombe* v. *Connecticut,* 367 U. S. 568, 605 (1961) (opinion of Frankfurter, J.)).

Just as *Townsend*'s instruction on the respect appropriately accorded state-court factfindings is now captured in the §2254(d) presumption, so we have adhered to *Townsend*'s definition of the §2254(d) term "factual issue."[8] The *Townsend* Court explained that by " 'issues of fact,' " it meant

support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

[7] The list of circumstances warranting an evidentiary hearing in a federal habeas proceeding set out in H. R. Rep. No. 1384, 88th Cong., 2d Sess., 25 (1964), is similar to the list set out in *Townsend* v. *Sain,* 372 U. S. 293, 313 (1963). The legislative history further indicates that the House Judiciary Committee, in framing its recommendations, was mindful of the Court's recent precedent, including *Townsend.* H. R. Rep. No. 1384, *supra,* at 24–25. See also 1 J. Liebman & R. Hertz, Federal Habeas Corpus Practice and Procedure §20.1a, pp. 537–538 (2d ed. 1994) (description of interplay between habeas statute and *Townsend*).

[8] *Keeney* v. *Tamayo-Reyes,* 504 U. S. 1 (1992), partially overruled *Townsend* on a point not relevant here; *Keeney* held that a "cause-and-prejudice" standard, rather than the "deliberate by-pass" standard, is the correct standard for excusing a habeas petitioner's failure to develop a material fact in state-court proceedings. 504 U. S., at 5–6.

"basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators . . . .'" 372 U. S., at 309, n. 6 (quoting *Brown* v. *Allen*, 344 U. S. 443, 506 (1953) (opinion of Frankfurter, J.)). "So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations," the *Townsend* Court added, "are not facts in this sense." 372 U. S., at 309, n. 6.[9] In applying § 2254(d), we have reaffirmed that "basic, primary, or historical facts" are the "factual issue[s]" to which the statutory presumption of correctness dominantly relates. See, *e. g.*, *Miller*, 474 U. S., at 112 ("[S]ubsidiary factual questions" in alleged involuntariness of confession cases are subject to the § 2254(d) presumption, but "the ultimate question"—requiring a "totality of the circumstances" assessment—"is a matter for independent federal determination."); *Cuyler* v. *Sullivan*, 446 U. S. 335, 342 (1980) ("mixed determination[s] of law and fact" generally are not subject to the § 2254(d) presumption of correctness).

It must be acknowledged, however, "that the Court has not charted an entirely clear course in this area." *Miller*, 474 U. S., at 113. In regard to § 2254(d), as in other contexts,[10] the proper characterization of a question as one of

---

[9] See also *Brown* v. *Allen*, 344 U. S. 443, 507 (1953) (opinion of Frankfurter, J.) ("Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts, the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.") (citation omitted).

[10] See, *e. g.*, *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 401 (1990) (observing in regard to appellate review of sanctions imposed under Fed. Rule Civ. Proc. 11: "The Court has long noted the difficulty of distinguishing between legal and factual issues."); *Pullman-Standard* v. *Swint*, 456 U. S. 273, 288 (1982) (acknowledging, in relation to appellate review of intent determinations in Title VII cases, "the vexing nature of the distinction between questions of fact and questions of law").

fact or law is sometimes slippery. See *ibid.; Wainwright* v. *Witt,* 469 U. S. 412, 429 (1985) ("It will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for § 2254(d) purposes . . . ."). Two lines of decisions compose the Court's § 2254(d) law/fact jurisprudence.

In several cases, the Court has classified as "factual issues" within § 2254(d)'s compass questions extending beyond the determination of "what happened." This category notably includes: competency to stand trial (*e. g., Maggio* v. *Fulford,* 462 U. S. 111, 117 (1983) *(per curiam)*); and juror impartiality (*e. g., Witt,* 469 U. S., at 429; *Patton* v. *Yount,* 467 U. S. 1025, 1036 (1984); *Rushen* v. *Spain,* 464 U. S. 114, 120 (1983)). While these issues encompass more than "basic, primary, or historical facts," their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor. See, *e. g., Witt,* 469 U. S., at 429 (Although the trial court is "applying some kind of legal standard to what [it] sees and hears," its "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record."). This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight." *Miller,* 474 U. S., at 114 (when an "issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court").

On the other hand, the Court has ranked as issues of law for § 2254(d) purposes: the voluntariness of a confession (*Miller,* 474 U. S., at 116); the effectiveness of counsel's assistance (*Strickland* v. *Washington,* 466 U. S. 668, 698 (1984)); and the potential conflict of interest arising out of an attorney's representation of multiple defendants (*Cuyler,* 446 U. S., at 341–342). "What happened" issues in these cases warranted a presumption of correctness, but the Court declared "the ultimate question" outside § 2254(d)'s domain

because of its "uniquely legal dimension." *Miller*, 474 U. S., at 116; see also *Sumner* v. *Mata*, 455 U. S. 591, 597 (1982) *(per curiam)* ("[T]he constitutionality of the pretrial identification procedures used in this case is a mixed question of law and fact that is not governed by § 2254(d)."); *Brewer* v. *Williams*, 430 U. S. 387, 397, and n. 4, 403–404 (1977) (waiver of Sixth Amendment right to assistance of counsel is not a question of historical fact, but rather requires application of constitutional principles to facts).

## B

The ultimate "in custody" determination for *Miranda* purposes, we are persuaded, fits within the latter class of cases. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances,[11] would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)* (quoting *Mathiason*, 429 U. S., at 495). The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U. S. C. § 2254(d). The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate

---

[11] The "totality of the circumstances" cast of the "in custody" determination, contrary to respondents' suggestions, does not mean deferential review is in order. See, *e. g.*, *Miller* v. *Fenton*, 474 U. S. 104, 117 (1985) (state-court determination "whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution" qualifies for independent review by federal habeas court).

determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

The practical considerations that have prompted the Court to type questions like juror bias and competency as "factual issue[s]," and therefore governed by § 2254(d)'s presumption of correctness, are not dominant here. As this case illustrates, the trial court's superior capacity to resolve credibility issues is not dispositive of the "in custody" inquiry.[12] Credibility determinations, as in the case of the alleged involuntariness of a confession, see *Miller*, 474 U. S., at 112, may sometimes contribute to the establishment of the historical facts and thus to identification of the "totality of the circumstances." But the crucial question entails an evaluation made after determination of those circumstances: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in *Miranda?*[13]

---

[12] As earlier observed, see *supra*, at 105, the trial court decided Thompson's motion to suppress his September 15 statements on the papers submitted without holding an evidentiary hearing.

[13] Respondents observe that "reasonable person" assessments, most prominently to gauge negligence in personal injury litigation, fall within the province of fact triers. See, *e. g., Cooter & Gell*, 496 U. S., at 402 (negligence determinations "generally reviewed deferentially"); *McAllister* v. *United States*, 348 U. S. 19, 20–23 (1954) (District Court finding of negligence was not "clearly erroneous"); 9A C. Wright & A. Miller, Federal Practice and Procedures § 2590 (2d ed. 1995). Traditionally, our legal system has entrusted negligence questions to jurors, inviting them to apply community standards. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 37, pp. 235–237 (5th ed. 1984). For that reason, "[t]he question usually is said to be one of fact," although "it should be apparent that the function of the jury in fixing the standard differs from that of the judge only in that it cannot be reduced to anything approaching a definite rule." *Id.*, at 237.

Judges alone make "in custody" assessments for *Miranda* purposes, and they do so with a view to identifying recurrent patterns, and advancing uniform outcomes. If they cannot supply "a definite rule," they nonetheless can reduce the area of uncertainty. See, *e. g., Illinois* v. *Perkins*, 496 U. S. 292, 296 (1990) (*Miranda* warnings not required prior to questioning of incarcerated individual by undercover agent because suspect, unaware

See *Berkemer* v. *McCarty*, 468 U. S. 420, 442 (1984) (court must assess "how a reasonable man in the suspect's position would have understood his situation"); cf. *Miller*, 474 U. S., at 116–117 ("[A]ssessments of credibility and demeanor are not crucial to the proper resolution of the ultimate issue of 'voluntariness.'").

Unlike the *voir dire* of a juror, *Patton*, 467 U. S., at 1038, or the determination of a defendant's competency, *Maggio*, 462 U. S., at 117, which "take[s] place in open court on a full record," *Miller*, 474 U. S., at 117, the trial court does not have a first-person vantage on whether a defendant was "in custody" for *Miranda* purposes. See 474 U. S., at 117 (police interrogations yielding confessions ordinarily occur, not in court, but in an "inherently more coercive environment"). Furthermore, in fathoming the state of mind of a potential juror or a defendant in order to answer the questions, "Is she free of bias?," "Is he competent to stand trial?," the trial court makes an individual-specific decision, one unlikely to have precedential value.[14] In contrast, "in custody" determinations do guide future decisions.[15] We thus conclude

of police presence, is not coerced); *Berkemer* v. *McCarty*, 468 U. S. 420, 436–439 (1984) (nature of suspected offense is irrelevant to duty to administer *Miranda* warnings); *Oregon* v. *Mathiason*, 429 U. S. 492, 495–496 (1977) *(per curiam)* (fact that interrogation occurs at police station does not, in itself, require *Miranda* warnings).

[14] In other contexts, we have similarly concluded that the likely absence of precedential value cuts against requiring plenary appellate review of a district court's determination. For example, in *Cooter & Gell* v. *Hartmarx Corp.*, a decision confirming that the abuse-of-discretion standard applies to appellate review of sanctions under Federal Rule of Civil Procedure 11, we observed that plenary review would likely " 'fail to produce the normal law-clarifying benefits that come from an appellate decision on a question of law . . . .' " 496 U. S., at 404 (quoting *Pierce* v. *Underwood*, 487 U. S. 552, 561 (1988)).

[15] See, *e. g.*, *Stansbury* v. *California*, 511 U. S. 318, 322–324 (1994) *(per curiam)* (review of precedent demonstrated a "well settled" principle: officer's undisclosed, subjective belief that person questioned is a suspect is irrelevant to objective "in custody" determination); *Pennsylvania*

that once the historical facts are resolved, the state court is not "in an appreciably better position than the federal habeas court to make [the ultimate] determination" of the consistency of the law enforcement officer's conduct with the federal *Miranda* warning requirement. See 474 U. S., at 117.

Notably, we have treated the "in custody" question as one of law when States complained that their courts had erroneously expanded the meaning of "custodial interrogation." See *Beheler*, 463 U. S., at 1121–1125 (summarily reversing California Court of Appeal's judgment that respondent was "in custody"); *Mathiason*, 429 U. S., at 494–496 (summarily reversing Oregon Supreme Court's determination that respondent was "in custody"); cf. *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975) ("[A] State may not impose . . . greater restrictions [on police activity] as a matter of *federal constitutional law* when this Court specifically refrains from imposing them."). It would be anomalous to type the question differently when an individual complains that the state courts had erroneously constricted the circumstances that add up to an "in custody" conclusion.

Classifying "in custody" as a determination qualifying for independent review should serve legitimate law enforcement interests as effectively as it serves to ensure protection of the right against self-incrimination. As our decisions bear out, the law declaration aspect of independent review potentially may guide police, unify precedent, and stabilize the law. See, *e. g., Berkemer*, 468 U. S., at 436–439 (routine traffic stop—typically temporary, brief, and public—does not place driver "in custody" for *Miranda* warning purposes); see also Monaghan, Constitutional Fact Review, 85 Colum. L. Rev. 229, 273–276 (1985) ("norm elaboration occurs best when the Court has power to consider fully a series of closely

v. *Bruder*, 488 U. S. 9, 11 (1988) *(per curiam)* (summary reversal appropriate because state-court decision was contrary to rule of *Berkemer* v. *McCarty*, 468 U. S. 420 (1984), that ordinary traffic stops do not involve "custody" for purposes of *Miranda*).

related situations"; case-by-case elaboration when a constitutional right is implicated may more accurately be described as law declaration than as law application).

\* \* \*

Applying § 2254(d)'s presumption of correctness to the Alaska court's "in custody" determination, both the District Court and the Court of Appeals ruled that Thompson was not "in custody" and thus not entitled to *Miranda* warnings. Because we conclude that state-court "in custody" determinations warrant independent review by a federal habeas court, the judgment of the United States Court of Appeals for the Ninth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE joins, dissenting.

Carl Thompson murdered his ex-wife, stabbing her 29 times. He then wrapped her body in chains and a bedspread and tossed the corpse into a water-filled gravel pit. As part of their investigation, police officers in Fairbanks, Alaska, questioned Thompson about his role in the murder, and Thompson confessed. Thompson was repeatedly told that he could leave the interview and was, in fact, permitted to leave at the close of questioning. I believe that the Alaska trial judge—who first decided this question almost a decade ago—was in a far better position than a federal habeas court to determine whether Thompson was "in custody" for purposes of *Miranda* v. *Arizona,* 384 U. S. 436 (1966). So long as that judgment finds fair support in the record, I would presume that it is correct. I dissent.

To determine whether a person is "in custody" under *Miranda,* "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on

freedom of movement" of the degree associated with a formal arrest.'" *Stansbury* v. *California,* 511 U. S. 318, 322 (1994) (quoting *California* v. *Beheler,* 463 U. S. 1121, 1125 (1983) *(per curiam),* quoting in turn *Oregon* v. *Mathiason,* 429 U. S. 492, 495 (1977) *(per curiam)).* "'[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" 511 U. S., at 324 (quoting *Berkemer* v. *McCarty,* 468 U. S. 420, 442 (1984)).

I agree with the majority that a legal standard must be applied by a state trial judge in making the *Miranda* custody inquiry. In light of our more recent decisions applying § 2254(d), however, I do not agree that the standards articulated in *Townsend* v. *Sain,* 372 U. S. 293 (1963), overruled in part by *Keeney* v. *Tamayo-Reyes,* 504 U. S. 1, 5 (1992), for distinguishing factual issues from mixed questions of law and fact, dictate a result either way in this case. See, *e. g., Wainwright* v. *Witt,* 469 U. S. 412, 429 (1985) (juror bias determination is a question of fact, even though "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears"); *Patton* v. *Yount,* 467 U. S. 1025, 1037, n. 12 (1984) (juror bias is a question of fact although "[t]here are, of course, factual and legal questions to be considered in deciding whether a juror is qualified"). Because the *Miranda* custody issue "falls somewhere between a pristine legal standard and a simple historical fact," we must decide, "as a matter of the sound administration of justice, [which] judicial actor is better positioned . . . to decide the issue in question." *Miller* v. *Fenton,* 474 U. S. 104, 114 (1985).

The state trial judge is, in my estimation, the best-positioned judicial actor to decide the relatively straightforward and fact-laden question of *Miranda* custody. See *California* v. *Beheler, supra,* at 1128 (STEVENS, J., dissenting) (state "courts are far better equipped than we are to assess the police practices that are highly relevant to the determination whether particular circumstances amount to custodial

interrogation"). In making the custody determination, the state trial judge must consider a complex of diverse and case-specific factors in an effort to gain an overall sense of the defendant's situation at the time of the interrogation. These factors include, at a minimum, the location, timing, and length of the interview, the nature and tone of the questioning, whether the defendant came to the place of questioning voluntarily, the use of physical contact or physical restraint, and the demeanor of all of the key players, both during the interview and in any proceedings held in court. In assessing all of these facts, the state trial judge will often take live testimony, consider documentary evidence, and listen to audiotapes or watch videotapes of the interrogation. Assessments of credibility and demeanor are crucial to the ultimate determination, for the trial judge will often have to weigh conflicting accounts of what transpired. The trial judge is also likely to draw inferences, which are similarly entitled to deference, from "physical or documentary evidence or . . . other facts." *Anderson* v. *Bessemer City*, 470 U. S. 564, 574 (1985). The *Miranda* custody inquiry is thus often a matter of "shades and degrees," *Withrow* v. *Williams*, 507 U. S. 680, 712 (1993) (O'CONNOR, J., concurring in part and dissenting in part), that requires the state trial judge to make any number of " 'fact-intensive, close calls.' " *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 404 (1990) (citation omitted).

The majority is quite right that the test contains an objective component—how a "reasonable man in the suspect's position would have understood his situation," *Stansbury* v. *California, supra,* at 324—but this alone cannot be dispositive of whether the determination should be reviewed deferentially. See, *e. g., Cooter & Gell* v. *Hartmarx Corp., supra,* at 402 (Rule 11 and negligence determinations, both of which involve objective tests, are subject to deferential review). "[T]he line between pure facts . . . and . . . the application to them of a legal standard that is as non-technical—as commonsensical—as reasonableness is a faint one." *United*

*States* v. *Humphrey*, 34 F. 3d 551, 559 (CA7 1994) (Posner, C. J., concurring). It distorts reality to say that all of the subtle, factbound assessments that go into determining what it was like to be in the suspect's shoes simply go out the window when it comes time for the "ultimate inquiry," *ante*, at 112, of how a reasonable person would have assessed the situation. "The state trial court [is] in the unique position, after observing [the defendant] and listening to the evidence presented at trial, to determine whether a reasonable person in [defendant's] position would have felt free to leave the police station." *Purvis* v. *Dugger*, 932 F. 2d 1413, 1419 (CA11 1991), cert. denied, 503 U. S. 940 (1992). It is only in light of these case-specific determinations that the reasonable person test can be meaningfully applied. See *Cooter & Gell* v. *Hartmarx Corp.*, *supra*, at 402 ("Familiar with the issues and litigants, the [trial] court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard").

For these reasons, I have no doubt that the state trier of fact is best situated to put himself in the suspect's shoes, and consequently is in a better position to determine what it would have been like for a reasonable man to be in the suspect's shoes. Federal habeas courts, often reviewing the cold record as much as a decade after the initial determination, are in an inferior position to make this assessment. Though some of the state court's factual determinations may, perhaps, be reflected on the record, many of the case-specific assessments that underlie the state trial judge's ultimate determination are subtle, difficult to reduce to writing, and unlikely to be preserved in any meaningful way for review on appeal. "State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect." *Brecht* v. *Abrahamson*, 507 U. S. 619, 636 (1993). "Absent indication to the contrary, state courts should be presumed to have applied federal law as faithfully as federal courts." *Withrow* v. *Williams*, *supra*, at 723 (SCALIA, J., concurring in part and

dissenting in part). We insult our colleagues in the States when we imply, as we do today, that state judges are not sufficiently competent and reliable to make a decision as straightforward as whether a person was in custody for purposes of *Miranda.* See 507 U. S., at 714 (O'CONNOR, J., concurring in part and dissenting in part) ("We can depend on law enforcement officials to administer *[Miranda]* warnings in the first instance and the state courts to provide a remedy when law enforcement officers err").[1]

I also see no reason to remand this case to the Ninth Circuit *for further analysis.* There is no dispute that Thompson came to the police station voluntarily. There is no dispute that he was repeatedly told he could leave the police station at any time. And it is also clear that he left the police station freely at the end of the interrogation. In *California* v. *Beheler,* 463 U. S. 1121 (1983) *(per curiam),* we held that a person is not in custody if "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." *Ibid.* And in *Oregon* v. *Mathiason,* 429 U. S. 492 (1977) *(per curiam),* we found it "clear" that the defendant was not in *Miranda* custody where he "came voluntarily to the police

---

[1] The majority believes that federal oversight of state-court custody judgments is necessary to "advanc[e] uniform outcomes," and when that cannot be achieved, to "reduce the area of uncertainty." *Ante,* at 113, n. 13. While uniformity of outcome is a virtue worth pursuing generally, we determined in a line of cases beginning with *Teague* v. *Lane,* 489 U. S. 288 (1989) (plurality opinion), that on habeas, uniformity must give way to concerns of comity and finality. See *id.,* at 310 ("The 'costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus . . . generally far outweigh the benefits of this application'") (quoting *Solem* v. *Stumes,* 465 U. S. 638, 654 (1984) (Powell, J., concurring in judgment)). Federal habeas review is not the time for fine-tuning constitutional rules of criminal procedure at the expense of valid state convictions based on reasonable applications of then-existing law. See *Butler* v. *McKellar,* 494 U. S. 407, 414 (1990) ("The 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts").

station, . . . was immediately informed that he was not under arrest," and "[a]t the close of a ½-hour interview . . . did in fact leave the police station without hindrance." *Id.*, at 495; see also *ibid.* ("Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect"). Because Thompson cannot establish a *Miranda* violation even under *de novo* review, I would resolve that question now, and avoid putting the State of Alaska to the uncertainty and expense of defending for the sixth time in nine years an eminently reasonable judgment secured against a confessed murderer.[2]

I respectfully dissent.

---

[2] To the extent Thompson's claim has any merit at all, it seems certain that relief is barred by our decision in *Teague* v. *Lane, supra,* at 301, 310 (plurality opinion), and its progeny. "The interests in finality, predictability, and comity underlying our new rule jurisprudence may be undermined to an equal degree by the invocation of a rule that was not dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent." *Stringer* v. *Black,* 503 U. S. 222, 228 (1992). In this case, it is clear that "granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." *Ibid.* In light of *Beheler* and *Mathiason,* the State's judgment was, at the very least, reasonable. And *"Teague* insulates on habeas review the state courts' ' "reasonable, good-faith interpretations of existing precedents." ' " *Wright* v. *West,* 505 U. S. 277, 292, n. 8 (1992) (opinion of THOMAS, J.) (quoting *Sawyer* v. *Smith,* 497 U. S. 227, 234 (1990), quoting in turn *Butler* v. *McKellar, supra,* at 414).