SLIP OPINION

Cite as 2014 Ark. 266

# SUPREME COURT OF ARKANSAS

No. CR-13-908

| | | |
|---|---|---|
| STATE OF ARKANSAS | | **Opinion Delivered** June 5, 2014 |
| | APPELLANT | |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, [NO. 60CR-12-2036] |
| MARK WRIGHT | | HONORABLE LEON JOHNSON, JUDGE |
| | APPELLEE | |
| | | <u>APPEAL DISMISSED</u>. |

**JIM HANNAH, Chief Justice**

The State brings an interlocutory appeal pursuant to Arkansas Rule of Appellate Procedure–Criminal 3 (2013) and contends that the circuit court erred in suppressing the statements of appellee Mark Wright. The State, as it must do under Rule 3, asserts in its jurisdictional statement that the correct and uniform administration of justice requires our review of this matter. We disagree and, accordingly, we dismiss the appeal.

The record reveals the following facts. On June 28, 2012, the prosecuting attorney of the Sixth Judicial District filed an information charging Wright with one count of sexual assault in the third degree, which occurred in January 2010, and one count of sexual assault in the fourth degree, which occurred in October 2009 through January 2010. The basis of the charges was that Wright, while employed as a sergeant at the Wrightsville Unit of the Arkansas Department of Correction ("ADC") engaged in sexual intercourse and sexual contact with an inmate who was then in the custody of the Wrightsville Unit. After the

charges had been filed, Wright filed a motion to suppress, contending that statements he had made in a recorded interview on December 21, 2011, to Special Agent Joe Pickett of the Arkansas State Police as part of the application process to be a state trooper should be suppressed because they had been made involuntarily and without his having been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The State responded, contending that when Wright gave the statements, he was not in custody and, consequently, there was no *Miranda* violation. The State also contended that Pickett did not take Wright's statements "as part of an investigation into these alleged acts and offered no promises of leniency and consideration."

Pickett was the sole witness at the July 22, 2013 suppression hearing. He testified that he administers polygraph examinations for both criminal investigations and the trooper-application process. Pickett conducted a pre-polygraph interview with Wright on December 21, 2011, in an interview at the state police headquarters in connection with Wright's application to be a trooper. Pickett explained that the purpose of the pre-polygraph interview is to go through an applicant's preemployment questionnaire or life history, known as "the book," in order to make sure that it is complete and correct before the polygraph examination is administered. At the time of the interview, Wright was under investigation by the state police for his alleged crimes against an inmate. Although Pickett was aware of the investigation, he testified that he did not learn that Wright was the subject of the investigation until shortly before the pre-polygraph interview began.

Pickett video recorded the interview, and a DVD of the interview was admitted into

evidence at the hearing and played for the circuit court.[1] Pickett told Wright that the purpose of the interview was to go over Wright's answers in the book. Pickett asked Wright if he was familiar with polygraph examinations, and Wright responded that he was familiar only with a "voice stress analyzer" because he had been "voice stressed . . . about alleged . . . misconduct on an inmate at ADC." Wright then stated that an inmate claimed that he had had sex with her, and Wright denied the allegation. Pickett told Wright that the pre-polygraph interview was not a criminal investigation and that he needed to be truthful during the interview so he could pass the test—a requirement to work for the state police. Pickett then told Wright that if he had engaged in any sexual contact with an inmate, he needed to "get that out" in the pre-polygraph interview or he would not pass the polygraph test. Thereafter, Pickett reviewed with Wright a polygraph–waiver form, which Pickett said included a *Miranda* warning, a waiver of rights, and a statement that Wright was taking the polygraph test voluntarily. The DVD shows Wright reading and signing some papers, but there are no signed papers in the record.

After Wright had given a quick summary of his life, Pickett began to ask him questions about his answers in the book. Wright verified his answers in the book, including that he had been suspended for being late to work and that he had had sexual contact with a coworker while at work at ADC in 2009. After admitting sexual contact with a coworker,

---

[1]The record reveals that a transcript of the interview was "entered only for purposes of [the suppression] hearing." The transcript states that Wright "read and signed an ASP-58 Polygraph Examination Release Form and Complete Truthfulness Statement regarding his application. The ASP-58 contains a complete Miranda Warning." No form was introduced at the hearing.

Wright said, "I'll lose my job for that I guess." Pickett responded, "No, listen man . . . this doesn't go to anybody. . . . This doesn't go to your boss, and he can't even get a copy of this. I don't care who it is. I don't care if he's the governor. He ain't gonna see it, okay. So I want you to relax about that kinda stuff all right." Pickett then resumed asking Wright about his answers in the book, including questions such as whether Wright had ever stolen from an employer, whether his driver's license had been suspended or revoked, whether he had ever falsified a police report, whether he had ever had debts that had been referred to a collection agency, whether his wages had ever been garnished, whether he had ever used illegal drugs, and whether he had been involved in any criminal activity.

Pickett then asked Wright if there was any "other activity" that might be criminal in nature or might affect the polygraph examination and told Wright that he had to tell the truth about those things if he wanted to pass the polygraph. Pickett told Wright to start with what he had been accused of, and Wright stated that a woman had alleged that he had had sex with her while she was an inmate at Wrightsville. Wright stated that he did not have sex with the inmate, but that he had held her, kissed her, and "grabbed her on the ass." Pickett asked Wright if he wanted to "put that in this book," and Wright responded that he was probably going to lose his job. Pickett replied, "They ain't even gonna see this book, I'm telling you. I'm telling you, this ain't leaving this building." Wright stated that Dexter Holmes, the trooper investigating the allegation, was "in this building," and Pickett told Wright that the book would be locked away and that Holmes did not have keys. Wright continued to state that he was going to lose his job and his family, and Pickett continued to

tell Wright that he was only being tested on the book. When Wright referred to the inmate's allegation, Pickett said, "You think that's what you're here for?" Wright said, "Yes," and Pickett responded, "I advise you you're over thinking it, man." Pickett then told Wright to put down in writing what he had told him because the "failure to answer all questions in this book and those asked in part of your [polygraph] examination completely and honestly will result in your removal from the hiring process." When Wright expressed concern about writing down what he had told Pickett, Pickett said, "What's the difference between putting it on paper and saying it out loud? . . . What's done is done. . . We can either move forward or we can just stop." Wright replied, "No, I don't want to stop, but I still want to have somewhere to work."

Pickett then told Wright that he was going to leave the room for ten or fifteen minutes to give Wright time to decide whether he wanted to continue with the hiring process. Pickett encouraged Wright to continue and stated that he should put in writing what he had said about the incident involving the inmate. Wright stated that, while he did not want to give up, he also did not want to go to jail. Pickett told Wright that he was not taking him to jail, only seeking to give him a polygraph examination. Pickett again stated that he was leaving the room and told Wright to write in the book if he wanted to, but if he did not write in the book, the hiring process was over. Pickett then left the room for several minutes.

While Pickett was gone, Wright began writing in the book. When Pickett returned to the interview room, he told Wright that he had reviewed the inmate's statement and that she had alleged that Wright had pulled her into a closet in the infirmary. Wright stated, "I'm

going to lose my job when I . . . write this statement, but I never pulled her or raped her or anything like that," and added that, "with the ADC policy, it is considered rape, no matter what." Pickett stated that he did not care about ADC policy, and Wright continued writing.

After Wright had finished writing, Pickett asked him if the situation was as bad as the inmate had alleged, and Wright maintained that it was not rape, but he admitted that he had engaged in sexual intercourse with the inmate. Pickett then told Wright that he was going down the hall to ask a coworker whether Wright could still be tested in light of what he had said, and he told Wright not to leave the room. When Pickett returned to the room, he informed Wright that he could not be tested due to his admission. Pickett then let Wright leave the building through the lobby.

In an order entered August 5, 2013, the circuit court granted Wright's motion to suppress. The State brings this interlocutory appeal and contends that, to the extent that the circuit court's suppression ruling is premised on the concepts of interrogation and custody stemming from *Miranda*, it was wrong. According to the State, there is no *Miranda* issue in this case because Wright was never in custody. Alternatively, the State contends that even if *Miranda* is applicable, the circuit court erred in suppressing Wright's statements because Wright had been advised of his rights under *Miranda* and had waived them. Finally, the State contends that, to the extent that the circuit court ruled that Wright's statements were involuntary because they were induced by false promises or deception, the circuit court

erred.[2]

As a threshold matter, we must determine whether the State may appeal the circuit court's ruling. This court has stated many times that the State's ability to appeal is not a matter of right but limited to those cases described under Rule 3 of the Arkansas Rules of Appellate Procedure–Criminal. *E.g.*, *State v. Weatherspoon*, 2009 Ark. 459, at 3. Pursuant to Rule 3, an interlocutory appeal on behalf of the State may be taken only from a pretrial order in a felony prosecution which (1) grants a motion under Arkansas Rule of Criminal Procedure 16.2 to suppress seized evidence, (2) suppresses a defendant's confession, or (3) grants a motion under Arkansas Rule of Evidence 411(c) to allow evidence of the victim's prior sexual contact. Ark. R. App. P.–Crim. 3(a). We will not consider an interlocutory appeal filed under Rule 3(a) unless the correct and uniform administration of the criminal law requires review by this court. *See* Ark. R. App. P.–Crim. 3(d).

As a matter of practice, our court has only taken appeals that are narrow in scope and involve the interpretation of law. *E.g.*, *Weatherspoon*, 2009 Ark. 459, at 3. We do not permit State appeals merely to demonstrate that the circuit court erred. *E.g.*, *State v. Jenkins*, 2011 Ark. 2, at 4. Moreover, this court will not accept an appeal by the State when the circuit court has acted within its discretion after making an evidentiary decision based on the particular facts of the case or even a mixed question of law and fact, as those appeals do not require interpretation of our criminal rules with widespread ramifications. *Id.* at 4–5; *see also*

---

[2]The State notes in its brief that, "[a]lthough it did not explicitly say so," the circuit court "appear[ed]" to find that Wright's "statements were induced by false promises or deception, rendering them involuntary and requiring their suppression."

*Weatherspoon*, 2009 Ark. 459, at 3 (stating that when an appeal does not present an issue of interpretation of our criminal rules with widespread ramifications, it is not an appeal involving the correct and uniform administration of the law).

We are not persuaded by the State's contention that a decision in this case would establish an important precedent for the correct and uniform administration of the law because the case "involves the significant issues of whether an applicant to be a law-enforcement officer is the subject of a custodial interrogation during a pre-polygraph interview, whether the provision of *Miranda* warnings at the outset of such an interview weighs against the admissibility of any statements during its course, and whether misleading statements by a law-enforcement officer in the course of an interrogation renders any admissions involuntary." Rather, we agree with Wright's contention that the issues in this appeal involve the application, not the interpretation, of laws regarding custodial interrogation, *Miranda* rights, and voluntary confessions. Here, the circuit court reviewed unique circumstances[3] and decided mixed questions of law and fact. *See Thompson v. Keohone*, 516 U.S. 99, 112–13 (1995) (holding that the issue of whether a person is in custody for purposes of *Miranda* is a mixed question of law and fact); *See Jenkins*, 2011 Ark. 2, at 5–6 (citing *Thompson* and holding that an issue involving a mixed question of law and fact is not a permissive ground for an appeal by the State); *State v. Guthrie*, 341 Ark. 624, 629–30, 19

---

[3]Indeed, when questioned by the circuit court at the suppression hearing about how often he interviews state-trooper applicants who have been accused of sexual misconduct, Pickett said, "This was a unique situation."

S.W.3d 10, 14 (2000) (stating that this court will not assume the role of fact-finder and reevaluate the circuit court's decision on an evidentiary matter and noting that this court will not engage in a search for error if any determination it made would not set precedent or serve as a guide in future prosecutions). Because the circuit court's ruling in this case resulted from its review of unique circumstances and required it to decide mixed questions of law and fact, we must conclude that the correct and uniform administration of justice is not at issue. *See, e.g.*, *State v. Hart*, 329 Ark. 582, 585, 952 S.W.2d 138, 139 (1997). Accordingly, we dismiss the State's appeal.

Appeal dismissed.

*Dustin McDaniel*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellant.

*Brian Bowen*, for appellee.