WATFORD, Circuit Judge,
concurring:
I agree with my colleagues that we are forced to affirm, given the deferential standard of review imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See 28 U.S.C. § 2254(d)(1). I offer a few additional thoughts to explain why I find that outcome troubling. If .this case is any indication, California courts are giving virtually dispositive weight to the fact that a suspect has been told he is not under arrest, even when all other circumstances suggest that the suspect is “in custody” for Miranda purposes.
The Supreme Court devised the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to protect the Fifth Amendment *422 privilege against self-incrimination. The Court believed that “incommunicado interrogation of individuals in a police-dominated atmosphere” generates “inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.” Id. at 445, 467, 86 S.Ct. 1602. The Court concluded that the warnings it prescribed were needed “to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination.” Id. at 467, 86 S.Ct. 1602. The Court has pegged the trigger for Miranda warnings to the concept of “custody,” defined to mean either formal arrest or circumstances in which the suspect has otherwise been “deprived of his freedom of action in any significant way.” Id. at 444, 86 S.Ct. 1602; see Berkemer v. McCarty, 468 U.S. 420, 428-81, 434, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
The police subjected the petitioner in this case, Jovon’z Smith, to incommunicado interrogation in a police-dominated atmosphere — namely, a small, windowless room in the bowels of the police station, without his parents or any other family members present. Interrogating a suspect in that setting, the Court recognized in Miranda, gives the police a significant psychological advantage in overcoming a suspect’s desire to remain silent. Why? Mainly because the suspect is alone, cut off from the rest of the world, in surroundings that are intimidating and unfamiliar. The Court put it this way in Miranda, quoting from a police training textbook:
“If at all practicable, the interrogation should take place in the investigator’s office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.”
Id. at 449-50, 86 S.Ct. 1602 (quoting Charles E. O’Hara & Gregory L. O’Hara, Fundamentals of Criminal Investigation 99 (1956)).
The police could nevertheless interrogate Smith without providing Miranda warnings so long as he wasn’t “in custody” — in other words, so long as a reasonable person in Smith’s shoes would have felt “at liberty to terminate the interrogation and leave.” Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Applying this test, the California courts held that Smith was never in custody, relying primarily on the fact that officers told Smith he wasn’t under arrest on three occasions. But all the other circumstances surrounding Smith’s interrogation suggest that he wasn’t free to leave whenever he wanted, notwithstanding the admonitions he had been given.
First, officers constrained Smith’s ability to leave by confiscating his property. About an hour into the interrogation, the police took Smith’s cell phone and did not return it. (They had earlier taken his backpack.) The signal sent by that action seems obvious to me. When the police confiscate a valuable piece of your personal property (in today’s world that certainly describes one’s cell phone), everyone understands that, as a practical matter, you’re not likely to leave without it. See Florida v. Royer, 460 U.S. 491, 504 n. 9, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); id. at 512, 103 S.Ct. 1319 (Brennan, J., concurring in the judgment). *423 So, despite assurances that he was not under arrest, the reality is that Smith’s freedom to terminate the encounter'was dependent almost from the outset upon the officers’ willingness to return his property.
Second, the officers’ responses to Smith’s questions strongly suggested that he would not be permitted to leave until the officers had finished questioning him. About an hour and a half into the interrogation, Smith informed Detective Fong that he had basketball practice at 4:00 p.m., although by then it was already a little after 4:00. In response, Detective Fong didn’t tell Smith that he was running late and had better leave right away. She instead instructed him to “hang tight” and said she would let the officer leading the interrogation (Detective Mustard) know about Smith’s prior commitment.
Later, roughly two and a half hours into the interrogation, Smith agreed to take a lie detector test and asked the officer administering the test, “After this, will I be able to go home?” The officer didn’t respond with the only answer consistent with Smith’s supposed freedom to leave, which would have been “yes, of course.” Instead, he told Smith, “Hey, you know, I don’t know. Are you and Detective Mustard done talking?” That response seems pretty clearly to indicate that Smith wasn’t free to leave whenever he chose but rather only when Detective Mustard had finished interrogating him. That the officer hastily added, “You understand you’re not under arrest, okay?” doesn’t seem to change anything. A reasonable person who asks whether he can go home and is told that the answer depends on whether the police are done questioning him probably won’t feel “at liberty to terminate the interrogation and leave.” Thompson, 516 U.S. at 112, 116 S.Ct. 457.
Finally, even if Smith should have understood up until this point that he was free to leave (notwithstanding the decidedly mixed signals he had been sent), what happened next surely had to affect Smith’s thinking. After Smith completed the lie detector test, the officer administering the test left the room and then returned a short time later with Detective Mustard. The officers told Smith he had failed the test. Is it really reasonable to think that Smith could have said at that point, “Thank you very much, I’ll be leaving now”? I find it hard to imagine any reasonable person, much less a reasonable 16-year-old, feeling free to walk out of the police station in those circumstances.
From that point on, the officers used the results of the lie detector test to convey to Smith that they would not end their questioning until he told them what they wanted to hear. Smith repeatedly tried to explain that he hadn’t done anything intentional to hurt the child, but the officers interrupted him each time and told him that they didn’t believe him. Four hours into the interrogation, the two detectives made their position clear: “Jovon’z, it didn’t happen like that,” said one. “You can’t leave this room lying, bro,” added the other. As the majority notes, the state courts never even addressed this last statement. Considered in context, I see no reason why a reasonable person in Smith’s shoes wouldn’t have interpreted that statement literally.
The only circumstance the state courts identified as suggesting Smith was not in custody is the fact that he had been advised three times he was not under arrest and once that he could leave at any time. The state courts placed essentially disposi-tive weight on those advisements in evaluating the totality of the circumstances, even though each of those advisements was undermined by subsequent events during the interrogation. The first time Smith was told he was not under arrest *424 occurred at school, before Smith even arrived at the police station and thus before the interrogation even began. The second time occurred at the very outset of the interrogation, which was also the only time the officers told Smith he could leave at any time. And the third time Smith was told he was not under arrest occurred just before he took the lie detector test, as part of the highly equivocal response to Smith’s asking whether he could go home afterward.
In giving all-but-dispositive weight to a “you’re not under arrest” advisement, the California courts appear to be validating a practice adopted by at least some California police departments. Those departments interpret existing Supreme Court precedent, particularly California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam), to mean that so long as a suspect is told he’s not under arrest, officers need not provide Miranda warnings, even if the circumstances surrounding the interrogation give rise to the same “inherently compelling pressures” to speak that the warnings were designed to combat. See Charles D. Weis-selberg, Mourning Miranda, 96 Calif. L. Rev. 1519, 1542-45 (2008) (canvassing police training materials used in California). Using this tactic to skirt the requirements of Miranda is apparently common enough in some law enforcement circles that officers have coined a short-hand term for it. Shortly after the interrogation at issue in this case begins, Detective Mustard enters the room to take the lead in questioning Smith. Before doing so he turns to Detective Fong and asks, ‘You Beheler-ing here?”
Despite my misgivings about the correctness of the California courts’ ruling in this case, I think we are compelled to affirm under AEDPA. On the one hand, the Supreme Court’s decision in Beheler seems to hold that telling a suspect he’s not under arrest is just one of many circumstances courts must evaluate when deciding whether someone is in custody, not a circumstance that’s entitled to overriding weight. It’s hard to square that reading of Beheler with the rule the California courts used to decide this case: “We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.” On the other hand, however, the Supreme Court has never explicitly clarified how much weight a “you’re not under arrest” advisement may be given, much less explicitly forbidden state courts to give such an advisement the heavy weight it received here. So I can’t say, under existing Supreme Court precedent, that the California courts” decision represents an unreasonable application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Until the Supreme Court says otherwise, California courts will remain free to validate the “Beheler-ing” of suspects, even when that practice is used to evade Miranda’s requirements.