

1996 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

11-14-1996

# Berryman v. Morton

Precedential or Non-Precedential:

Docket 95-5468

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Berryman v. Morton" (1996). *1996 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5468


EARL BERRYMAN

v.

WILLIS MORTON, Administrator, New Jersey
State Prison, Trenton, New Jersey, and
PETER VERNIERO, Attorney General of the
State of New Jersey

Appellants


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY GRANTING A WRIT OF
HABEAS CORPUS


(Civil No. 94-3828 (DRD))


Argued February 8, 1996
Before: BECKER, ROTH and McKEE, Circuit Judges


(Opinion filed: November 14, 1996)

PETER VERNIERO, ESQ.
Attorney General of New Jersey
LINDA K. DANIELSON, ESQ. (Argued)
Office of Attorney General of

New Jersey
Department of Law & Public Safety
CN 086
Division of Criminal Justice
Richard J. Hughes Justice Complex
Trenton, New Jersey  08625

Attorneys for Appellants

JEAN D. BARRETT, ESQ. (Argued)
Ruhnke & Barrett
20 Northfield Avenue
West Orange, NJ  07052

Attorneys for Appellees


OPINION OF THE COURT


McKEE, Circuit Judge
    Willis Morton, Administrator of the New Jersey State Prison at Trenton, and Peter Verniero, Attorney General of the State of New Jersey, appeal the district court's order granting a writ of habeas corpus to appellee, Earl Berryman. The district court granted the writ based upon its determination that Berryman had been denied effective assistance of trial counsel. For the reasons set forth below, we will affirm.

                                I.
    March 11, 1983 was Alice Campos' eighteenth birthday. According to Campos, she and her friend, Christina Dos Santos, went to a club called "Studio One" in Newark, New Jersey, where a group of between 15 and 20 friends joined them to celebrate Campos' birthday.  At approximately 2:30 a.m. on March 12, Campos and Dos Santos left the club, and Campos drove Dos Santos to the Irvington, New Jersey home of Dos Santos' mother, where Campos dropped Dos Santos off.
    Shortly after driving away, Campos stopped at a traffic light and a man whom she later identified as Michael Bunch forced his way into her car.  According to Campos' subsequent trial testimony, Bunch put a knife to her throat and forced his way into the driver's seat.  Bunch then told Campos to remove her stockings. Campos responded by removing her panty hose and handing them to Bunch.
    Bunch then opened the front passenger door and a man Campos later identified as Anthony Bludson got in and sat next to Campos.  Bunch took $35 from Campos' purse, and ordered "[d]on't think about running because my friend got a gun."  Campos then heard what she thought was the "click" of a gun; however, she never saw a gun.
    Bunch and Bludson drove to a nearby supermarket parking lot where a man Campos later identified as petitioner, Earl Berryman, was waiting in a blue car.  Campos was ordered to get into the rear seat of the blue car which Bunch then drove while Berryman sat in the front passenger seat, and Bludson sat in the rear with Campos.  Campos testified that she could see the faces of all three men. According to her testimony, Berryman's face was only

six to eight inches away as she was getting into the blue car. In her initial statement to police, however, Campos said she was blindfolded with her stockings after Bunch and Bludson got into her car, and before they were joined by the male identified as Berryman.

The trio drove Campos around for about two hours. They made her lie down on the floor of the back of the car that entire time. Finally, the car stopped at a "burned-out" building, and the three carried Campos inside. Once inside the building they made her remove her clothes and lie down on a mattress. Each of the three men then took turns raping her.

According to her testimony, after the sexual assault, the three men ordered her to get dressed, and Bludson put a knife in her back and walked her back to the blue car. They all got in, and Bunch drove the entire group back to Campos' car. There, Campos was released, and the three men drove away.

Later that same morning, at approximately 6:00, Campos returned to Dos Santos' house, and told Dos Santos and Dos Santos' mother what had happened. Campos testified that she was ashamed, frightened, and hysterical. Because she was so upset and because she did not think she could report the incident until the next business day, she did not report the rape for two days.

When she did contact the police on Monday, March 14, Detective Samuel Williams of the Irvington Township Police Department had her look through photographs of Black males arranged alphabetically by last name (the names were not visible to Campos) in "sleeves", or "books". Each book contained approximately 100 to 150 photographs. Campos looked at all of the photographs in the first sleeve that contained only photographs of Black men whose last name began with "A". She was unable to identify anyone, and proceeded to the "B" sleeve. She selected the photographs of Earl Berryman, Michael Bunch and Anthony Lee Bludson from that book. Campos did not look at any more photographs because she appeared to have identified all three of her attackers from the "B" sleeve. Thus, she never saw police photos of anyone whose last name ended in the letters "C" through "Z".

That same day, Campos was examined by Ingrid Brown, M.D. Dr. Brown found physical evidence consistent with rape, and also discovered that Campos was infected with vaginal and rectal gonorrhea. Campos did not have gonorrhea before the assault. Dr. Brown did not attempt to use a "rape kit" to retrieve traces of any excretions that could have identified the attackers because of the amount of time that had passed since the assault.

Based upon Campos' identifications, Detective Williams sent letters to the last known address of Berryman, Bunch and Bludson, but Berryman's letter was returned to the police by the post office on March 17, 1983.

Despite repeated requests from Detective Williams, Campos did not return to police headquarters to sign a complaint until April 21, 1983. In the meantime, Detective Williams did nothing further to ascertain where Berryman lived, and he apparently investigated the matter no further. Williams testified that he took no further action because his superior, Sergeant Michael

Tomich, told him to "lay off" the rape investigation. Bunch was a suspect in an unrelated, but ongoing, bank robbery/homicide investigation which had taken place two days after the rape, and Detective Tomich apparently hoped that Bunch would incriminate himself in the more serious homicide if he remained on the street.

More than a year passed before the police tried to arrest anyone. Finally, on January 19, 1984, Berryman, Bludson and Bunch were named in a seven-count indictment and charged with various offenses stemming from the kidnapping, and assault of Campos. Bludson's trial was severed from the joint trial of Berryman and Bunch. Bludson went to trial first, and had to be tried twice because his initial trial ended with a hung jury and a mistrial. His second trial resulted in an acquittal.

Berryman and Bunch went to trial in March of 1985. Their first trial also ended in a mistrial when a juror disclosed her improper discussions with fellow jurors. The retrial began immediately, and concluded with the conviction of both Berryman and Bunch. Berryman was sentenced in July of 1985 to an aggregate term of imprisonment of 50 years with a parole ineligibility period of 25 years.

At his trial, Berryman denied participation in the crime. He took the stand in his own defense and testified that he had neither a driver's license nor car, and that he had never met Bunch nor Bludson. Berryman had a steady employment history and had not previously been indicted. His conviction rested entirely upon Ms. Campos' uncorroborated identification.

Campos had testified at both of Bunch's trials before testifying against Berryman and Bludson. Her testimony at the Bunch trials differed from the descriptions she gave in Berryman's trial, yet, Berryman's attorney did not use the prior inconsistent testimony to cast doubt upon Campos' identification. He also failed to call either Bludson or Dos Santos as defense witnesses. Berryman's attorney did, however, manage to elicit testimony that allowed the jury to discover that Bunch was under investigation for a bank robbery homicide which tended to associate Berryman with that investigation, and with Bunch.

## II.

Berryman and Bunch appealed their convictions to the Appellate Division of the Superior Court of New Jersey. They alleged that the trial court had improperly admitted evidence of the unrelated homicide investigation, and that they had been denied the effective assistance of trial counsel. However, the Appellate Division affirmed the trial court's determination that defense counsel had opened the door to the admission of the testimony regarding the unrelated bank robbery homicide investigation. The Appellate Division also held that any evidence as to why Bludson was not called as a witness was outside the scope of the record. However, the court allowed issues relating to trial counsel's effectiveness to be raised in a motion for post-conviction relief. Further direct review of the conviction was apparently not sought.

Berryman and Bunch then filed petitions for post-conviction

relief, alleging ineffective assistance of counsel.  Berryman argued that his counsel had been ineffective (1) in failing to use Campos' inconsistent identification testimony from the Bludson trial; (2) in opening the door to the admission of testimony concerning the bank robbery homicide investigation of Bunch; and (3) in failing to call Bludson and Dos Santos as defense witnesses.

Berryman's trial attorney testified at a hearing that was held on the post-conviction petition, and explained his reasons for conducting Berryman's defense as he had. The post-conviction hearing court thereafter issued an oral opinion in which it found that trial counsel had made a reasonable investigation to determine the location of Bludson; that the determination not to call Dos Santos as a witness had been a strategic one; that Campos' inconsistent testimony at the Bludson trial would have been insignificant, and in any event, that failure to impeach her with it had been an appropriate strategic choice by defense counsel; and that counsel's actions in opening the door to the bank robbery homicide investigation of Bunch also had been a reasonable trial strategy.  The court further concluded, as to each allegation of ineffectiveness, that even if the performance had been deficient, the deficiency did not deprive Berryman of a fair trial.  The Appellate Division affirmed in an unpublished written opinion, New Jersey v. Berryman, A2388-91T5 (App. Div. May 20, 1993) (hereinafter referred to as "slip opinion"), and the New Jersey Supreme Court denied certification.

                                III.

Berryman filed a petition for a writ of habeas corpus in the district court for the district of New Jersey pursuant to 28 U.S.C. § 2254.  The district court summarized Berryman's claim of ineffectiveness as follows:

> petitioner's counsel Nicholas DePalma (i) on cross-examination of Campos failed to avail himself of prior testimony which would have cast serious doubt upon Campos' ability to identify petitioner, (ii) failed to investigate and use two witnesses who could have cast further doubt on Campos' testimony, and (iii) asked questions on cross-examination and called a witness knowing that these actions would bring to the jury's attention the fact that co-defendant Bunch was under investigation for homicide/bank robbery.

Dist. Ct. Op. at 6-7.

The standard for reviewing a claim of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious

that counsel was not functioning as the
"counsel" guaranteed the defendant by the
Sixth Amendment. Second, the defendant must
show that the deficient performance
prejudiced the defense. This requires
showing that counsel's errors were so serious
as to deprive the defendant of a fair trial,
a trial whose result is reliable.

466 U.S. at 687. In essence, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" meaning "reasonableness under prevailing professional norms." Id. at 688. Our review of the district court's decision is plenary. Reese v. Fulcomer, 946 F.2d 247, 253 (3d Cir. 1991), cert. denied, 503 U.S. 988 (1992). However, our evaluation of counsel's performance is "highly deferential" as a reviewing court must make "every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. That is to say, the "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955).

IV.

28 U.S.C. § 2254 governs federal habeas corpus proceedings instituted by state prisoners. After Berryman filed his petition, 28 U.S.C. § 2254 was amended. The effect of these amendments on Berryman's petition is discussed below. However, since a traditional section 2254 analysis is helpful to an understanding of the effect of the amendment, we begin with a discussion of the relevant law at the time Berryman filed his petition.

When Berryman filed his petition in the district court, the habeas statute provided that state court findings of fact were presumed correct if the following requirements were met: (1) a hearing on the merits of a factual issue, (2) made by a state court of competent jurisdiction, (3) in a proceeding to which the petitioner and the state were parties, (4) evidenced by a written finding, opinion or other reliable and adequate written indicia. 28 U.S.C. § 2254(d); Reese v. Fulcomer, 946 F.2d 247, 254 (3d Cir. 1991), cert. denied, 503 U.S. 988 (1992). Where these requirements are met, "'the underlying facts about counsel's performance are entitled to the presumption of correctness under 28 U.S.C. § 2254(d), if fairly supported by the record.'" Id. (emphasis added). It is only where the state court's factual determinations are not fairly supported by the record, that the presumption of correctness does not apply. 28 U.S.C. § 2254(d)(8). Section 2254(d) "'reflect[ed] a clear congressional policy favoring deference to state findings of fact absent good cause for rejecting such findings.'" Id. at 256 (quoting Nelson v. Fulcomer, 911 F.2d 928, 932 (3d Cir. 1990)).

Factual issues are "basic, primary or historical facts:

facts 'in the sense of a recital of external events and the credibility of their narrators. . . .'" Townsend v. Sain, 372 U.S. 293, 309 (1963)(quoting Brown v. Allen, 344 U.S. 443, 506 (1953)). It is these "factual issues" to which the statutory presumption of correctness predominately relates. Thompson v. Keohane, U.S. , 116 S.Ct. 457, 464 (1995). "[A] trial court is better positioned to make decisions of this genre, and [the Supreme Court] has therefore accorded the judgment of the jurist-observer presumptive weight." Keohane, 116 S.Ct. at 464. (Citations omitted and internal quotation marks omitted).

In a state prisoner's habeas petition alleging ineffective assistance of counsel, state court findings of fact made in the course of determining an ineffectiveness claim are subject to the deference requirement of § 2254(d), so long as they are fairly supported by the record. Strickland v. Washington, 466 U.S. at 698; McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.), cert. denied, U.S. , 114 S.Ct. 645 (1993)(state court findings of historical fact made in the course of deciding an ineffectiveness claim are presumptively correct if they meet the requirements of 28 U.S.C. § 2254(d)).

However, a state court's conclusion that counsel rendered effective assistance "is not a finding of fact binding on the court to the extent required by 28 U.S.C. § 2254(d)." Id. Effectiveness is not a question of historical fact. Id. As noted earlier, an inquiry into effectiveness of counsel under Strickland has two components, performance and prejudice, and it is a mixed question of law and fact. Id.; see also Reese v. Fulcomer, 946 F.2d 247, 254 (3d Cir. 1991), cert. denied, 503 U.S. 988 (1992). Therefore, an ineffectiveness claim "require[s] the application of a legal standard to the historical-fact determinations." Townsend v. Sain, 372 U.S. at 310 n. 6. In brief, the "'ultimate question'" of counsel's effectiveness is "outside of § 2254's domain because of its 'uniquely legal dimension.'" Koehane, 116 S.Ct. at 465.

Applying these principles to a Strickland ineffectiveness analysis, it is apparent that a state court's finding that counsel had a trial strategy is a finding of fact to which the habeas court must afford the presumption of correctness if that factual finding is supported by the record. However, the question of whether counsel's strategy was reasonable goes directly to the performance prong of the Strickland test, thus requiring the application of legal principles, and de novo review.

> This Court's review of an ineffective assistance of counsel claim is de novo because it is a mixed question of law and fact. Subsidiary factual questions found by state courts are entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d). The question of whether a decision was a tactical one is a question of fact. . . . However, whether this tactic was reasonable is a question of law, and we owe neither the district court nor the state court any

deference on this point.

Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) (citations omitted).

Here, a state court has already determined that trial counsel's conduct of petitioner's defense was based upon a trial strategy, and that the strategy was reasonable.  The district court's thoughtful and thorough opinion can be interpreted as holding that trial counsel had no trial strategy at all. However, it can also be read as concluding that counsel did have a strategy, but the state court erred in holding that it was reasonable.  We conclude that no matter which way the opinion is read, the district court's ruling must be affirmed under a traditional § 2254 analysis.

V.

In discussing trial counsel's explanation for his "stewardship" of defendant's defense, the district court stated "[f]or counsel to rest on a 'strategy' necessitates the existence of one. This case lacked strategy."  Dist. Ct. Op. at 14.  We believe that the state court's contrary conclusion that Mr. Berryman's trial attorney did have a trial strategy is not supported by the record.  The Appellate Division summarized the defense strategy as follows: "[t]he defense theory was generally that the victim was really not telling the truth about the rape and surrounding events and that even the police did not believe her."  Slip. Op., at 12.  Thus, that court reasoned that attempts to impeach the victim on discrepancies in her descriptions "would not have promoted the defense theory that the rape probably did not occur," Id. at 21, and defense counsel could not be faulted for failing to call Bludson because "the height discrepancy would not be persuasive to the jurors and . . . Bludson['s] testimony would not support the defense theory." Id. at 22.  To the extent that this conclusion is based upon a finding of fact that trial counsel actually had a theory or strategy, we must also afford it deference as "section 2254 makes no distinction between the factual determinations of a state trial court and those of a state appellate court." Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996).  However the state court's finding that Mr. DePalma based his defense on the "theory" that Ms. Campos was fabricating the rape, is belied by the record.  The district court correctly noted:

Mr. DePalma's post-trial testimony confirms that there was no trial strategy.  When questioned on his theory of the case, he replied, 'Theory of the case. . . there was no real theory.'  Again,

Q: Is it your practice to develop theory of your defense prior to opening to a jury in a case?

A: Not a theory of my defense, but a game plan.

> Then he claimed he had three theories: '[I]f
> you want to use the term theory, I had three
> theories, the identification was a theory, .
> . .the investigation was theory. . .and I
> don't know whether there was something third
> in there, but in my mind I think there was.'
> Finally, he believed that there was 'no value
> to choosing a theory, and proceeding.'

Dist. Ct. Op. at 13–14. (emphasis added).  Moreover, the record of the trial corroborates that Mr. DePalma's conduct of Berryman's defense was not guided by any strategy or theory.  In his closing, Mr. DePalma did suggest that Ms. Campos fabricated the rape: "[h]ow do we know she was raped? How do we know she didn't consent to the sexual affair?" Dist. Ct. Op. at 36. Yet, seconds later, in the same summation he argued: "[l]adies and gentlemen, she is not lying. The defense isn't alleging that she is lying to you," Id., and he then proceeded to cast doubt upon the accuracy of the identification.  Although an attorney can certainly make alternative arguments to a jury, Mr. DePalma's arguments were not in the alternative, they were unguided, and inept shots at anything that moved, or that appeared to move, with no apparent purpose, thought, or strategy.

> During the trial he continued to lose
> credibility. He tried to discredit a
> disinterested doctor.  During cross-
> examination he implied that evidence was
> destroyed. . . During the summation he
> stated: '[t]he only thing is when you ask her
> [the physician] about the investigation,
> she's giving you a runaround.' . . .
>    For counsel to rest on 'strategy'
> necessitates the existence of one. This case
> lacked strategy. Instead, it was a 'useless
> charade.' U.S. v. Cronic, 466 U.S. 648, n.
> 19. (1984). . . .
>   Having no trial strategy, defense counsel
> improvised as they went along, proceeding
> from blunder to blunder with disastrous
> consequences.

Dist. Ct. Op. at 20 (emphasis added).  We agree.

However, the district court's opinion can also be interpreted as holding that trial counsel had a strategy, but that it was not a "sound strategy." The court stated: "[b]ut no sound strategy existed in this case", and " []petitioner's counsel's post–trial testimony only confirms that there was no 'sound trial strategy.'"  Dist. Ct. Op. at 13.

Assuming arguendo that the district court intended its conclusion that Mr. DePalma lacked a "sound" strategy to mean that he had no "reasonable" strategy, we will inquire to see if a different result is required under traditional habeas analysis. In doing so we assume that the record does support the state

court's finding of a trial strategy. For purposes of our analysis we will interpret Mr. DePalma's "game plan" as the equivalent of a trial strategy and proceed with our inquiry under § 2254. However, as discussed above, the parameters of this inquiry are not limited by the presumption of correctness afforded factual findings required by 28 U.S.C. § 2254. That presumption does not attach to legal conclusions resulting from resolution of factual issues. Once counsel is found to have had a strategy, the reasonableness of that strategy is a mixed question of fact and law to which the presumption of correctness does not attach.

Here, the state argues that the state court found that Berryman's trial counsel had a strategy or "theory of the case," that he made tactical decisions throughout the trial in furtherance of that strategy, and that the strategy was reasonable. The state relies upon the presumption of correctness to strenuously argue that the state court findings of fact, including findings of the reasonableness of counsel's trial strategy, are supported by the record and consequently are presumptively correct.

The state's argument, however, confuses the findings of historical fact to which we must defer, with conclusions of law that we afford a plenary review. The later goes directly to the performance prong of the Strickland test, thus requiring the application of legal principles.

Horton v. Zant, 941 F.2d at 1462. Assuming that the state court correctly found that trial counsel had a strategy, we find that it erred in its legal conclusion as to the reasonableness of Mr. DePalma's "strategy" as to each of the grounds set forth in Berryman's petition.

A. Failure to use inconsistent identification testimony.

Berryman's conviction rested solely on the victim's uncorroborated out-of-court identification, and her in-court identification two years later. As noted above, this case resulted in a total of four trials. Bludson was tried twice (and was ultimately acquitted), and Berryman and Bunch were jointly tried twice. In each trial, Campos testified that the defendants played the following roles:

Bunch -- the first man with the knife who forced his way into her car at the traffic light.

Bludson -- the second man to get into her car at the traffic light.

Berryman -- the third man who waited in the blue car at the supermarket parking lot.

The height of the three defendants is critical. Bunch, at 6'4" is the tallest. Berryman is next and is of average height at 5'10". Bludson is the shortest at 5'5". Thus Berryman is nearly half a foot taller than Bludson, and half a foot shorter than Bunch. Bunch, in turn, towers over Bludson, as he is nearly a full foot taller.

In the first Bludson trial, Campos testified that Bunch, the man with the knife, was approximately 5'11". At that same trial,

Campos testified that Bludson, the short man, was 5'10" and was the same size as Bunch. She described Berryman as being the shortest.

In the second Bludson trial, apparently realizing the problems with her identification testimony, Campos retreated from that testimony and was effectively cross-examined on that issue. Because it goes to the heart of our analysis, we review that testimony at some length.

> Q: Well, how tall was the man with the knife? [Bunch]
>
> A: I can't tell you how tall he was. I know he was the tallest. He wasn't that tall but he was taller than both of them, than him and the other one.
>
> Q: The second man who got in the car, how tall was he?
>
> A: The second man?
>
> Q: Yes.
>
> A: That's him.
>
> Q: How tall was he?
>
> A: I don't know. I don't know. I can't tell how tall he was.
>
> Q: Before today you have been asked how tall he was, haven't you?
>
> A: Right.
>
> Q: And haven't you said about 5'10"?
>
> A: Yes, I told you that, 5'8", 5'10", I am not sure if he's that height.
>
> Q: And didn't you say that the first man was about 5'11"?
>
> A: About that.
>
> Q: And the third man --
>
>     [interruption by the Court]
>
> Q: And the third man, you said was about 5'4"?
>
> A: The third?

Q: Yes, the third man.

A: The third man.  I don't know what I said how tall he was because I told him before and I'm telling you right now I don't know.

Q: Weren't the first and second men about the same size, about 5'10", 5'11"?

A: The first man --

    [lengthy objection by the State
    which is overruled by the Court]

Q: Were not the first man with the knife and the second man who got in the car, weren't they about the same height, about 5'10", 5'11"?

A: The both of them that got in the car first?

Q: Yes.  The two men that got in the car first.

A: No. The other one was a little bit taller than him.  Not much but he was the tallest, like I said.

Q: Well, do you recall we had a hearing back on July 17 and you were in a courtroom like this and we had a hearing?

A: Yes.

Q: Do you recall being asked 'Was he taller or shorter than the man with the knife?'  Do you remember being asked that question?

A: Yes.

Q: And do you remember answering, 'I think the same size.'

A: No, I never said that -- I said he was the tallest, the other one maybe I said the same size but I never said he was -- I remember what I said.

Q: And the third man was much shorter than those two, is that right?

A: The third guy?

Q: Yes.

A: Yes.

Q: And do you remember at that hearing you testified when you said how tall he was?

A: Yes.

Q: And I think you said 6 feet.

A: I told you about 6 feet.  I don't know.

Q: And stand up, Mr. Bludson.  How tall did you say -- I asked you how tall Mr. Bludson was?

THE COURT: You mean as she views him standing now?

DEFENSE COUNSEL: Yes.

A: I told you I don't know but I said -- I remember I said about 5'9", 5'10".

Q: Well, looking at him now, how tall do you think he is?

A: 5'7".  I don't know.  I don't know.

(A16-18).

The district court noted that the descriptions of the three men given by Campos in the second Bludson trial differed radically from the actual height of each man, and differed from the identification testimony she gave at the first Bludson trial. Dist. Ct. Op. at 18.  The court further noted that despite the inconsistencies in Campos' descriptions, "petitioner's counsel never attempted to use the prior testimony to impeach Campos' identification of Berryman at the second trial.  Id. at 19.

Incredibly, when trial counsel explained his failure to use the inconsistent testimony to impeach Campos' identification of Berryman he said that it as a  "minor one" because "[t]here were a lot of major and substantial discrepancies in her story."  Id. As the district court correctly noted, that explanation "simply does not wash."

> Petitioner's counsel had in his hands material for a devastating cross-examination of Campos on the critical issue in the case. Because of his failure to confront her with her prior sworn testimony, the jury did not learn that she had previously described the height of her attackers under oath, that she had previously recanted prior testimony given

> under oath and that her prior descriptions
> were very different from her testimony at the
> Bunch/Berryman trial.

Id.

We agree. The district court correctly ruled that the state appellate court erred in minimizing the importance of this discrepancy. The Appellate Division held "[w]e conclude [that the lower court's] ruling has a reasonable basis in the record and that the failure to emphasize the victim's discrepancies regarding the height of her assailant. . . was neither fatally deficient nor prejudicial." (slip op. at 23). The district court concluded "[t]here is no way in which the failure to confront Campos with her prior inconsistent identification testimony can be justified as sound trial strategy or a reasonable strategic choice. It was an error of law for the state courts to have so held." Dist. Ct. Op. at 22. Indeed, it borders on the inconceivable that a trial attorney would fail to inform a jury of Ms. Campos' prior problems with this identification whether or not he or she was also arguing that the rape had been fabricated. The reliability of this victim's uncorroborated identification of Berryman cuts directly to the heart of the only evidence against Berryman. Mr. DePalma failed to use it. That failure simply can not be condoned as reasonable trial strategy. The district court correctly concluded that it was wholly unreasonable.

B. Opening the Door to the Homicide and Robbery.

Detective Williams testified at the first Bunch\Berryman trial. He told the jury about Campos' statement describing the attack, and the circumstances under which she selected the photographs of Bunch, Bludson, and Berryman. Williams' only other involvement had been to send the letters to the last known address of each defendant.

On cross-examination, counsel for both Bunch and Berryman decided to attack the lack of any thorough police investigation presumably to raise an inference that the police did not believe Campos. Proceeding down that road, Mr. DePalma asked Williams why he did not try to locate the defendants. Williams responded that a sergeant told him that one of the defendants was the subject of another investigation and that he should "lay-off."

Predictably, the prosecutor seized this opportunity on re-direct by asking Williams who and what was being investigated, and Williams told the jury that Bunch was a suspect in a homicide/bank robbery. Both defense counsel moved for a mistrial, but that motion was denied because defense counsel had opened the door. Mr. DePalma then called Sergeant Tomich as a defense witness, and Tomich confirmed that he told Williams to lay-off. In response to the prosecutor's questions, Detective Tomich testified that the other investigation was a joint one, involving the FBI; that three men were alleged to have committed the homicide; and that Bunch's brother, Barry, had already been convicted of the crimes. Defense counsel again greeted the fruits of his labors with a motion for a mistrial, which was denied as before.

As noted above, that first Bunch/Berryman trial ended in a mistrial because of juror misconduct. In the second trial, which began immediately, having learned absolutely nothing from the judge's rulings in the first trial, Mr. DePalma once again asked Williams why he had done nothing to pursue the investigation once the letter addressed to Berryman was returned by the post office. Counsel also attempted to elicit on cross examination that Williams was "skeptical of the circumstances that [the victim] was telling [him]." An objection to that question was sustained and counsel then asked whether Williams had "any personal attitude as to what [the victim] was telling [him]."

On re-direct, the prosecutor argued that defense counsel had once again opened the door. The trial court agreed, but commendably sought to ameliorate the prejudice that could flow from the line of questioning Mr. DePalma was insisting upon. The court ruled that Williams could only testify that the reason was the existence of another, unspecified, investigation involving Bunch which was unrelated to the sexual assault charge. Aware of the precipice that Mr. DePalma was marching toward, the trial court also warned the prosecutor and the detective not to bring out the fact that the other investigation involved a murder. Williams then testified in accordance with the limitations imposed by the trial court.

Despite the trial judge's laudable attempt to shield the jury from unduly prejudicial information, Mr. DePalma obliviously pursued a line of re-cross examination designed to suggest that Williams would not lay-off an investigation involving crimes as serious as rape and kidnapping. He did this even though he had just sat through a trial where this strategy had elicited testimony so damaging that he thought a mistrial was warranted. In order to counter the insinuations of Mr. DePalma's questions the prosecution sought, (to no one's surprise but Mr. DePalma's) and received, the court's permission to explain. Mr. DePalma's examination of Detective Williams therefore forced the trial judge to allow the jury to hear the very information the judge had tried to shield them from, and the witness testified that the other investigation involved a bank robbery and a homicide.

Amazingly, apparently content with the progress of his "game plan," Mr. DePalma once again called Detective Tomich as a defense witness, and Tomich once again testified that the investigation of Bunch was still open; that Bunch's brother had already been convicted, but that two other suspects remained at large; that Bunch had not been charged because Tomich felt that he did not have enough evidence; and that Bunch would always be considered a prime suspect in the bank robbery\homicide.

On direct appeal, the Appellate Division rejected the argument that the trial court erred in admitting this testimony because defense counsel's line of questioning invited the prejudicial testimony. At the post-conviction hearing, the state court concluded that Berryman's counsel had made a tactical decision to open the door to the bank robbery/homicide, opining that the decision was a "strategy to show the lack of police investigation so as to nullify the good affect (sic) the victim had on the jury." A114. That ruling was affirmed on appeal.

The district court disagreed. Trial counsel had conceded that it was risky to have "played with" this testimony. When asked to confirm that he had not intentionally opened the door to the prejudicial testimony he responded, "[n]o, but I played with it, lets put it that way." The prosecutor then stated, "[y]ou were taking a tremendous risk?" to which Mr. DePalma responded, "[r]ight." Dist. Ct. Op. at 29.

Indeed, it was foolhardy, and the district court correctly concluded that "it must rank as a striking instance of ineffective assistance of counsel." Id. at 30. Berryman's attorney "proceeded relentlessly to elicit the irrelevant testimony that was so damaging to his client." Id. at 29-30.

C. Failure to investigate potential defense witnesses.

The district court held that both Bludson, and Ms. Dos Santos could have discredited Campos' testimony, and counsel had no sound strategy to justify not using their testimony. Dos Santos testified at the post conviction hearing that she and Campos were alone at the club and not with 15 to 20 other people as Campos said. In addition to minor discrepancies, Dos Santos contradicted Campos' testimony that she had nothing to drink at the club. Dos Santos testified that Campos had one or two beers while they were there.

Dos Santos was never contacted by defense counsel, or anyone acting on his behalf in preparation for trial. Mr. DePalma explained that his investigation of Dos Santos consisted of unsuccessfully attempting to subpoena her during the course of the trial. He never spoke to her and never sent an investigator to look for her. The state post-conviction court concluded that Mr. DePalma's actions regarding Ms. Dos Santos were reasonable because he was concerned her testimony would provide a "corroborative 'fresh-complaint' witness" and undermine his attempt to make some mileage from the victim's delay in reporting the rape. The district court found that Mr. DePalma's failure to call Dos Santos could not be the result of a sound strategic choice because he never assembled the information necessary to make such a choice. Dist. Ct. Op. at 32. Accordingly, the district court concluded that Mr. DePalma's failure to call her could not have been the product of a reasoned strategic decision.

The Appellate Division also found that Berryman's counsel made reasonable efforts to locate Bludson and given Campos' "unshakable" identifications of the defendants, "evidence of Bludson's height would not be that helpful to the defense." (slip op. at 22). Given the degree to which Ms. Campos equivocated and recanted portions of her description at Mr. Bludson's trial, this record does not support a conclusion that her testimony was "unshakable." Indeed, Mr. Bludson's attorney was able to shake it sufficiently to raise a reasonable doubt as to the guilt of his client. Moreover, Mr. DePalma had ample information to suggest that Bludson was an important defense witness. The district court realized that Bludson was an important witness if for no other reason than the discrepancies in the physical descriptions given by Campos at the two Bludson trials. "By producing Bludson in court in connection with the previous testimony, defense counsel would have called into

question the entire identification made by the witness and would have supported the 'wrong man' theory-of-the-case." Dist. Ct. Op. at 32. However, despite Bludson's obvious importance to the case, Mr. DePalma did nothing more to locate Bludson than contacting the attorney who had represented Bludson at his criminal trial eight months earlier to see if he knew where Bludson was. The district court characterized the failure to call Bludson as a failure to adequately prepare for trial, and not as a strategic decision. Id. at 33. See Lewis v. Mazurkiewicz, 915 F.2d 106, 113 (3d. Cir. 1990). However, these two concepts are interwoven.

The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued. The district court quite correctly noted, however, that it does require a reasoned judgment as to the amount of investigation the particular circumstances of a given case require. An attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so. Id. at 114.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation.

> In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-691. Here, Bludson's significance to Berryman's defense required more than the minimal effort Mr. DePalma put forth to produce Bludson at Berryman's trial.

Bludson's mere presence at trial could have cast doubt upon Campos' identification. Campos testified that Bludson was the second man into the car and that he was the same height as Bunch, the first man into the car. However, Bunch, who is 6' 4", could not easily be confused with Bludson, who is 5' 5". Bludson's very presence in court at the Bunch/Berryman trials could have raised serious doubts about the victim's ability to identify her assailants. Indeed, had the jury seen Bludson, and learned of the inconsistencies in Campos' identifications and that she may have had a couple of beers before the incident, it is impossible to conclude with any degree of comfort that the verdict would have been the same. Given the dramatic effect Bludson's mere presence

could have had on the outcome of Berryman's trial, counsel was obligated to do more to find him.

Thus, whether the failure to call Bludson is viewed as failure to adequately prepare, or as an unreasonable choice of how to conduct the defense, it is clear that it fell below the standards required for reasonable representation of one's client.

D. Prejudice.

Even though we agree that trial counsel's woeful performance was not based upon any sound trial strategy, petitioner can not prevail under Strickland unless he was prejudiced by counsel's derelictions. In meeting the prejudice prong of an ineffectiveness claim

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, at 694. In other words, we must determine if "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. "If ever there were a case where prejudice . . . has been established, it is the present case." Dist. Ct. Op. at 33. "[I]t is highly probable that but for petitioner's attorney's egregious errors, the verdict as to petitioner would have been "not guilty." Id. at 34.

Berryman's jury never learned that Campos had previously described the height of her assailants very differently from her testimony at the Bunch/Berryman trials. The jury was therefore never able to properly evaluate the strength of her identification. We note that this is not merely a matter of a defense attorney deciding to forgo questioning an identification witness about minor discrepancies in her description, or the fact that her estimated height was off by a couple of inches. This jury had a unique opportunity. The actions of the three assailants, their role in the assault, and their identity could be related to their heights in respect to one another regardless of how tall each actually was. Campos' inability to consistently describe the actions of Berryman who was nearly half a foot taller than one defendant, and nearly half a foot shorter than the other, was information the jury needed in order to weigh the accuracy of Campos' identification. The prejudice to Berryman is obvious.

Berryman's guilt rested entirely on the accuracy of Ms. Campos' identification. Trial counsel had weapons that he could have used to attack that identification. He used none of them. It should have been obvious that Campos' inconsistent identification testimony from the Bludson trials could raise serious questions in the minds of the jurors regarding Campos' credibility and/or her ability to identify her assailants. Trial counsel regarded it as "minor" and didn't bother to use it. Thus the jury never knew of Campos' difficulty identifying her assailants. The

inconsistent description is made all the more compelling by a
discrepancy in Ms. Campos' testimony that the district court
notes.

> In her initial statement to authorities,
> Campos said that she had been blindfolded
> with her stockings from the moment the two
> men got into her car at the traffic light
> until she was returned to her car. Her trial
> testimony, that the first man in her car
> immediately ordered her to remove her
> stockings, tends to corroborate this version.
> If this were so, she could not have
> identified petitioner at all since, according
> to her testimony, he had not entered the
> picture until well after she would have been
> blindfolded.

Dist. Ct. Op. at 4, n. 1.

In addition, Ms. Dos Santos' testimony could have
established that Ms. Campos had consumed some alcohol immediately
prior to the rape. That is relevant to the victim's ability to
accurately identify her assailants, yet the jury was never
informed of this.

Counsel's failure to use any of these avenues in defense of
his client is bad enough. Worse yet, Mr. DePalma's handling of
Detective Williams and Detective Tomich informed the jury of
highly prejudicial and irrelevant information, and defeated the
trial judge's efforts to shield Mr. Berryman from the dangers of
Mr. DePalma's line of questioning  regarding the unrelated bank
robbery\homicide investigation. Once Mr. DePalma opened the door
to that information, "the prosecutor plunged the stilette which
petitioner's counsel had handed him." Dist. Ct. Op. at 40.

Counsel's derelictions are severe, and seriously undermine
the reliability of Berryman's conviction. The district court
quite correctly held that Berryman is entitled to the relief the
court granted.

## VI.

After the district court granted Berryman relief, after this
case was argued before this panel, and while the state's appeal
was pending, Congress enacted the Antiterrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat.
1214.  Section 104 of the AEDPA amends 28 U.S.C. § 2254, the
statute under which Berryman sought, and was granted, relief.
Section 104(2) of the AEDPA redesignates § 2254(d) as § 2254(e),
which then provides that a state court's determination of a
factual issue shall be presumed to be correct and further
provides that a habeas petitioner "shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."  In addition, Section 104(3) adds a new § 2254(d)
which reads:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

We have previously noted the enactment of the AEDPA and have applied § 104's amendments to a state prisoner's habeas petition, see Dickerson v. Vaughn, 90 F.3d 87 (3d Cir. 1996); however, we have not expressly determined if Congress intended that § 104 of the AEDPA applies retroactively to appeals or to petitions that were pending when the Act was passed. The Act specifically provides that it is to apply to death penalty cases "pending on or after the date of the enactment of the Act", i.e., April 24, 1996. § 211 of Pub. L. 104-132. However, the AEDPA is silent as to its application to pending habeas petitions in non-capital cases. Of the circuit courts of appeals that have had the opportunity to consider the retroactivity issue, two courts have determined that the AEDPA's changes to § 2254 are not to be applied retroactively, see Boria v. Keene, 90 F.3d 36 (2d. Cir. 1996) and Edens v. Hannigan, 87 F.3d 1109, 1112 n. 1 (10th Cir. 1996), and one court has found that the AEDPA is to be applied retroactively in non-capital cases. Lindh v. Murphy, No. 95-3608, 1996 WL 517290, (7th Cir. Sept. 12, 1996)(en banc).

In any event, there does seem to be agreement that Section 104(c) of the AEDPA changes the standard of review for cases where state prisoners challenge their convictions on the basis of alleged constitutional violations. We have opined, in dicta, that § 104(c) establishes a "more deferential test," Dickerson v. Vaughn, 90 F.3d at 90; however, we have not determined the extent of the deference that federal habeas courts must afford to the legal or the factual determinations made by state courts.

In Lindh v. Murphy, a majority of the judges on the Court of Appeals for the Seventh Circuit held that § 104(c) of the AEDPA "for the first time specifies the appropriate treatment of legal determinations by state courts." 1996 WL at * 2. Specifically, the Lindh majority held, with regard to the scope of review under § 104(3)(d)(1) of the AEDPA, that when the issue does not involve the meaning of the Constitution, but rather its application to a particular set of facts, i.e., when a mixed question of law and fact is presented, a district court can only grant habeas relief when the state court's decision "reflects 'an unreasonable application of' the law." Id. at * 13. According to the Lindhmajority, the answer to the question of whether the state court's

determination of a mixed question of law and fact is
unreasonable, "requires federal courts to take into account the
care with which the state court considered the subject."  Id. at
* 14.  The federal habeas court must defer to the state court's
determination of a mixed question of law and fact where that
determination is reasonable, that is, within the boundaries of
the law established by the Supreme Court.  Id.  It is only when
the federal habeas court is convinced that the state court's
determination of a mixed question of law and fact constitutes a
grave error can the state court's determination be found
unreasonable and only then can the federal habeas court upset a
judgment of the state court.  Id. (Section 2254(d)(1), as amended
by the AEDPA, "tells federal courts: Hands off, unless the
judgment in place is based on an error grave enough to be called
'unreasonable.'").  As the Lindh majority wrote:

> The Supreme Court of the United States sets
> the bounds of what is "reasonable"; a state
> decision within those limits must be
> respected -- not because it is right, or
> because federal courts must abandon their
> independent decisionmaking, but because the
> grave remedy of upsetting a judgment entered
> by another judicial system after full
> litigation is reserved for grave occasions.
> That is the principal change effected by §
> 2254(d)(1).

Id.

The Attorney General argues that the AEDPA is applicable to
this case and further argues that the changes wrought to §
2254(d) by § 104(3) of the AEDPA require that the district
court's grant of habeas relief to Berryman be reversed and his
conviction reinstated.  More specifically, the Attorney General
contends that the decision in Lindh v. Murphy requires that the
district court's decision here be reversed because the state
court's determination that Berryman's counsel was not ineffective
was "a reasonable, good faith interpretation of existing
precedent."  See Attorney General's letter of October 2,1996.

However, we need not determine whether the AEDPA's changes
to the habeas statute under which Berryman was granted relief are
to be applied retroactively because we are convinced that the
record clearly and convincingly shows that his trial counsel was
ineffective even if the AEDPA establishes a more deferential
standard.  Further, we are convinced that even if we apply the
standard of review for state court resolution of mixed questions
of fact and law discussed in Lindh v. Murphy, Berryman would
prevail.

As recited in Part IV of this opinion, the district court's
opinion can be read as holding that Berryman's trial counsel had
no trial strategy at all or it can be read as agreeing with the
state court that trial counsel had a strategy but disagreeing
with the state court's determination that the strategy was
reasonable.  As we understand the changes made to § 2254 by §
104(3) of the AEDPA, § 104(3)(d)(1) of the AEDPA would apply if

the district court's opinion is read as holding that trial counsel's strategy was not reasonable and § 104(3)(d)(2) would apply if the district court's opinion is read as holding that trial counsel had no strategy at all.

In regard to § 104(3)(d)(1), the Attorney General submits that Lindh v. Murphy requires that the federal habeas court must accept the state trial court's determination that trial counsel's strategy was reasonable because that determination was a reasonable, good faith interpretation of existing Supreme Court precedent. However, and assuming arguendo that Lindh correctly interpreted this section of the AEDPA, we disagree with the Attorney General's contention that the state court's determination was reasonable. We have already discussed why trial counsel's failure to use Campos' inconsistent identification testimony was wholly unreasonable, why his opening the door to the homicide and bank robbery investigation was foolhardy, irrelevant and damaging, and why his failure to investigate potential defense witnesses could not be considered the product of a reasoned strategic decision. Based on that discussion, we are convinced that the state court's determination that trial counsel had a reasonable trial strategy is an "error grave enough to be called 'unreasonable.'" Lindh, at * 14. Mr. DePalma's performance was severely deficient and his errors were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, at 687. As a result of his errors Berryman was deprived of a fair trial. Id. Given that woefully inadequate and deficient performance and the prejudice that performance caused Berryman, we cannot uphold the state court's determination that trial counsel had a reasonable trial strategy. That determination was clearly an unreasonable application of Strickland to the facts of this case.

In regard to § 104(3)(d)(2) of the AEDPA, a federal court must afford the presumption of correctness to factual determinations made by a state court unless the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented" in the state court. The habeas statute under which Berryman filed his petition provided that factual findings made by a state court are presumed correct "if fairly supported by the record." Reese v. Fulcomer, 946 F.2d at 254. The AEDPA did not dramatically change this provision of habeas jurisprudence. After all, a state court determination of a factual issue which was not fairly supported by the record can hardly be said to be a reasonable determination. Nonetheless, we will assume arguendo that the AEDPA establishes a more deferential standard which federal habeas courts must afford to factual determinations of state courts.

However, even applying the most conceivably deferential standard to the factual determination of the state court that trial counsel had a strategy, we conclude that that determination was unreasonable in light of the evidence presented in the state court. Trial counsel readily admitted that he had no strategy, but only a game plan, the parameters of which he could not recall. He was unable to explain what his third theory may have been. At one point in his closing he suggested that Campos

fabricated the entire rape, and moments later he told the jury that Campos was not lying.  As we noted earlier, counsel can certainly argue in the alternative, but that is not what counsel did as he contradicted himself in front of the jury.  Counsel's own testimony, and the record of his actions at the trial, plainly demonstrate that the state court's factual determination that trial counsel had a strategy was an unreasonable determination in light of the evidence presented in the state court proceedings.

We therefore conclude that the resolution of this habeas case does not differ under the habeas statute under which Berryman originally filed his petition or under the habeas statute as amended by § 104 of the AEDPA.

VII.

In conclusion, we hold that petitioner has met both prongs of the Strickland test and find that he was denied his Sixth Amendment right to effective assistance of counsel.  The order of the district court granting a petition for a writ of habeas corpus will be affirmed.