Juan **AGUILERA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–10–00304–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 29, 2011.

Discretionary Review Refused April 18, 2012.

by denying appellant's motion for an instructed verdict.

We affirm.

## Background

Appellant was a finance manager at Planet Ford in Spring, Texas. As a finance manager, appellant worked with customers to finalize sales, collect the funds, including any cash tendered, and send contracts to financial institutions for funding so that the dealership could get paid. Generally, the salesperson and sales manager create a handwritten buyer's order that is then taken to the finance manager. The finance manager then finalizes the deal and creates a typed contract.

In early June 2008, one of appellant's co-workers, Timothy Dowdley, another finance manager, overheard some other finance managers talking in a way that led him to believe they were removing funds from Planet Ford. Dowdley voiced concerns to Steven Loveless, the Finance Director at the time.

Loveless investigated and discovered some inconsistencies between the original contracts customers signed and the final bill for the car deals being funded by the banks. Loveless knew that a finance manager was involved because only a finance manager would be able to change the contracts. Loveless searched appellant's desk and found "[m]ultiple original signed contracts from customers in the bottom of his drawer." This was unusual because the original contracts actually belonged in the "deal folder once it's billed and sent to the bank." Loveless then reviewed the deals associated with the contracts he found in appellant's desk drawer. He discovered that the signatures on the contracts from appellant's drawer did not match other signatures in the file and that the amounts

George O. Jacobs, Houston, TX, for Appellant.

Erin Craig, Assistant District Attorney, Patricia R. Lykos, Harris County District Attorney, Houston, TX, for The State of Texas.

Panel consists of Justices KEYES, HIGLEY, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

A jury found appellant, Juan Aguilera, guilty of theft of property valued between $1,500 and $20,000.[1] Pursuant to an agreement between appellant and the State, the trial court assessed his punishment at two years' confinement, suspended his sentence of confinement, and placed him on community supervision for three years. The conditions of appellant's supervision included serving forty-five days in the Harris County Jail and paying $4,000 in restitution, among others. In four issues, appellant argues that the trial court erred (1) by denying his motion to suppress his confession; (2) by limiting his closing argument to fifteen minutes; (3) by denying his requested charge instruction on corroboration of the confession; and (4)

1. *See* TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2011).

of the down payments had been decreased. Loveless knew that appellant was the "only one to receive the funds" from the customers.

Loveless revealed what he had found to Shawn Burns, the general sales manager, and together they decided to talk to appellant to see whether they could discover any more information regarding the inconsistent contracts. Loveless and Burns asked appellant to enter Burns's office, and they confronted him about what Loveless had uncovered. According to Loveless, appellant originally denied any involvement, so they showed him the documents recovered from his desk drawer. They asked Deputy R. Pleasant to join them in the office to discuss the thefts with appellant and to provide them with some advice. Deputy Pleasant is an officer with the Harris County Sheriff's Office ("HCSO") who also provided security at Planet Ford as an approved extra job. Appellant admitted his involvement in the thefts to Loveless, Burns, and Deputy Pleasant.

Based on what appellant stated to him during this interview, Loveless testified:

[Appellant] would get an approval from a bank on a loan and then at the time he would sign them up before he would actually send over the—bill the deal, he would take in the down payment but he would take some of the down payment and take it out of the contract and keep it and then write up a new contract with less down payment and cut the selling price so it would match the funded amount from the bank so then there would be no discrepancy between the amount he got the loan for and the amount that [he] billed the deal with. . . .

Deputy Pleasant also heard appellant's admission that he—along with a few other employees—was involved in the scheme.

Deputy Pleasant then took a written statement from appellant, typing appellant's account of how he managed the deals to steal "upwards of $10,000," which appellant then split with the others involved. Deputy Pleasant testified that appellant told him that he had personally received approximately $4,000 in this manner. Deputy Pleasant had appellant review and sign the typed statement.

Appellant moved to suppress the written statement, and, after a hearing, the trial court denied his motion. In addition to the testimony of Dowdley, Loveless, and Pleasant, the State introduced appellant's written statement and six other documents consisting of sales records that were offered along with the testimony of Carolyn Lastor, Planet Ford's comptroller. Lastor explained that the documents showed appellant as the finance manager who signed the paperwork on the deals with inconsistencies between the cash received from the customers and what was ultimately reported on the final bills.

Appellant testified on his own behalf. He testified that he followed the proper procedures for closing the car sales represented in the sales documents presented by Lastor and that no customer had ever complained to him about inconsistencies or changes in the documentation. He further testified that he relied on the information he received on the hand-written buyer's order from the salesperson or sales manager and that "[i]f the salesperson and the customer are in agreement on something that is money that is not reflected in the contract," he would have no way of knowing about that unless he was told. He also testified that the paperwork could have been made by other people at Planet Ford who would have access to the file even after it went through accounting.

Appellant testified that when he talked to Burns and Loveless they already had a

list of names of people they thought were involved, and he began to fear that he would lose his job. He thought when he signed the statement typed by Deputy Pleasant that it was just part of the procedure for investigating the thefts, and he did not voluntarily confess. He directly testified that he did not "take any money on the side from any customers or any of the salesmen." He also testified that, although he initialed the portion of the written statement indicating that his share of the thefts had been about $4,000, those words were actually written by Deputy Pleasant, and he initialed the statement at Deputy Pleasant's direction.

The jury found appellant guilty, and this appeal followed.

## Motion to Suppress

In his first issue, appellant complains that the trial court erred in denying his motion to suppress his written statement.

### A. Background on Motion to Suppress

Appellant moved the trial court to suppress his written statement on the ground that it was obtained illegally because he was under arrest or substantially deprived of his freedom at the time he made the statement, was not informed of his right to counsel or right to remain silent, did not waive those rights, and did not freely and voluntarily give the statement.

At the suppression hearing, Loveless testified that appellant was a finance manager and was responsible for finalizing contracts or purchase orders when customers decided to buy a vehicle. He became suspicious that appellant was involved in stealing money and confronted him. He testified that he and the general manager of the dealership, Shawn Burns, asked appellant to enter Burns's office "to discuss if he wanted to give us any information about stealing money voluntarily." When appellant did not volunteer any information, Loveless and Burns "confronted him with what knowledge [they] had of him stealing the down payments," including contracts and other documents indicating appellant's involvement in the theft. However, appellant still denied being involved.

Loveless testified that, at that point, he and Burns "brought in Mr.—Officer Pleasant to I guess bring more seriousness to the matter. . . ." Deputy Pleasant entered the office wearing his uniform and weapon and stood next to Burns. Loveless stated that he and Burns "let Mr. Pleasant explain the seriousness of the situation" and appellant then "agreed that he did steal the money." Loveless asked Deputy Pleasant "what's our next step?" and Deputy Pleasant indicated that they needed to get appellant's written statement. Loveless testified that he, Deputy Pleasant, and appellant then went to his office where they prepared appellant's written statement and that he was present when the statement was taken. Loveless testified that appellant was sitting near the door, that the door was unobstructed, and that appellant could have left at any time. Loveless further testified that appellant described how he had taken portions of the cash payments that had passed through his hands and provided names of others who were involved, had an opportunity to read the finished statement, and signed it in the presence of Loveless and Deputy Pleasant.

Deputy Pleasant testified that he was working on his regular patrol assignment with HCSO on the day he took appellant's statement and that someone from Planet Ford asked him to come to the dealership because they had a possible internal theft. Deputy Pleasant went to the dealership after his shift was over. He testified that he entered Burns's office, where Burns, Loveless, and appellant were already talk-

ing, and that he was not involved in getting appellant into Burns's office. Pleasant testified that when he entered the office, appellant admitted his involvement in the theft. Deputy Pleasant stated that he "[a]sked [appellant] if he would provide a statement on his involvement [with] the theft" and appellant agreed. They went across the hall to Loveless's office, where appellant gave his statement. Pleasant testified that he did not make any threats or promises to get appellant to give the statement. Appellant told Deputy Pleasant the details of the theft. Deputy Pleasant typed the details onto the statement form, then had appellant review the statement, initial each paragraph, and sign the statement.

After Deputy Pleasant took appellant's statement, he took the statement of another employee allegedly involved in the theft. Finally, he contacted the district attorney, and, approximately fifteen to twenty minutes later, handcuffed appellant and "placed him in the car [to be] taken to the substation." Deputy Pleasant testified that he used a form for taking voluntary statements that did not include *Miranda* warnings because appellant was not in custody at the time he gave his statement. Deputy Pleasant also testified that when asked by someone at Planet Ford what would happen, he told him, "[I]f [appellant] walked off, I couldn't do nothing about it, basically I'd have to get a warrant for him." Pleasant also testified that he did not recall escorting appellant to the bathroom.

Appellant testified that when he was called into Burns's office, Loveless, Burns and Deputy Pleasant were all present. They confronted him about the theft, and Deputy Pleasant "basically started saying, hey, look, this is what we have, this is what we can do and, you know, just basically started saying again what they were accus-

ing me of." Deputy Pleasant also mentioned the possible ramifications of theft, such as serving jail time. Appellant also testified that Burns's "voice was very, very loud and he was using expletives, and you know, MF me a couple of times but that's Burns, I've more [sic] than him for a long time, I know how he is." Appellant also acknowledged that he was acquainted with Deputy Pleasant, who had provided security at Planet Ford for some time. Appellant testified that he did not "realize he was confessing," but that the statement did contain his exact words "in the way that what I thought I was doing was giving a statement in reflection to what they said I was being accused of," although Deputy Pleasant did "fill in the blank[s]" for him. Appellant testified that he read over the statement, initialed each paragraph, and wrote his initials on the signature line. Appellant stated that he initialed the statement because "[i]t looked like it was part of the procedure of what we're going through at that point" and because he thought the dealership was attempting to discover other people involved in the theft.

Appellant also testified that, after he gave his statement, he asked to go to the restroom. He stated that Deputy Pleasant went with him, stayed with him in the restroom the entire time, and escorted him back to the office. Appellant testified that when he went into Loveless's office, he did not feel like he could leave and felt like he was under arrest.

On cross examination, appellant testified that, in retrospect, he realized that he could have left at any time. On redirect examination, his counsel asked,

[Counsel]: What did you think about your ability to leave the office? You said when you first got into the office that Deputy Pleasant was there, what was your feelings about if you had gotten up and tried to leave?

[Appellant]: Well, I really didn't have a thought either way. It became more apparent to me whenever I asked him, hey, I got to go to the restroom and he wouldn't let me go by myself but that was already way, way, way into this whole thing.

. . . .

I didn't [have the feeling that I could get up and leave or go away,] not after he accompanied me to the restrooms.

The trial court found that the statement was not the result of a custodial interrogation and was freely and voluntarily given by appellant. The trial court did not make any other findings.

## B. Standard of Review

We review the denial of a motion to suppress for abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex.Crim.App.2008). We give almost total deference to the trial court's express or implied determinations of historical facts and review de novo the court's application of the law to those facts. *Id.* We view the evidence in the light most favorable to the trial court's ruling. *Id.* The trial court is the "sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony." *St. George v. State*, 237 S.W.3d 720, 725 (Tex.Crim.App. 2007). If the trial court's determination is correct on any theory of law applicable to the case and reasonably supported by the evidence, we will uphold the determination. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim.App.2003).

Article 38.21 of the Code of Criminal Procedure provides that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion. . . ." Tex.Code Crim. Proc. Ann. art. 38.21 (Vernon 2005);

*Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex.Crim.App.2008). A statement is not voluntary if it is given in violation of *Miranda v. Arizona*, which is codified in Article 38.22 of the Code of Criminal Procedure. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 2 (Vernon 2005); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

■ Article 38.22 provides, in relevant part, that "[n]o written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless" certain warnings about his right to remain silent and his right to counsel appear "on the face of the statement," and "the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning. . . ." Tex.Code Crim. Proc. Ann. art. 38.22, § 2. A person must receive a *Miranda* warning when he is subject to a custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. However, neither *Miranda* nor Article 38.22 prohibits the admission of a statement that is not the product of a custodial interrogation. Tex.Code Crim. Proc. Ann. art. 38.22, §§ 2, 5; *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The defendant bears the initial burden of proving that a statement was the product of a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex.Crim.App.2007).

■ Custodial interrogations occur when law enforcement officers initiate the questioning of a person who has been taken into custody or otherwise deprived of freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *Roquemore v. State*, 60 S.W.3d 862, 868 (Tex.Crim.App.2001) ("A custodial interrogation occurs when a defendant is in custody and is exposed 'to any words or actions

on the part of the police ... that [the police] should know are reasonably likely to elicit an incriminating response.'"). A person is "in custody" if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996).

■■■ In determining whether an individual is in custody, we first examine all of the circumstances surrounding the interrogation to determine if there was a formal arrest or "restraint of freedom of movement to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994). This determination focuses on the objective circumstances of the interrogation and not on the subjective views of either the interrogating officers or the person being questioned. *Id.* at 323, 114 S.Ct. at 1529. We next consider whether, in light of the particular circumstances, a reasonable person would have felt that he was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). Factors relevant to a custody determination include: (1) probable cause to arrest; (2) subjective intent of the police; (3) focus of the investigation; and (4) subjective belief of the defendant. *Dowthitt*, 931 S.W.2d at 254. Because, under *Stansbury*, the custody determination is based entirely on objective circumstances, factors two and four are irrelevant except to the extent that they are manifested in the words or actions of law enforcement officials. *Id.* (citing *Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529). Furthermore, being the focus of the investigation, by itself, does not amount to being in custody. *See Meek v. State*, 790 S.W.2d 618, 621 (Tex.Crim.App. 1990).

Police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Dowthitt*, 931 S.W.2d at 255. The following situations generally constitute custody: (1) when the suspect is physically deprived of freedom to act in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; or (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* "Concerning the first through third situations, *Stansbury* indicates that the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Id.* Concerning the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and does not, by itself, establish custody. *Id.* Rather, a suspect is in custody if "the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id.*

C. Analysis

■■■ We begin by observing that the "safeguards attendant to custodial interrogation do not come into play unless the person to whom the statements are made is acting as an agent of law enforcement pursuant to police practice." *Oriji v. State*, 150 S.W.3d 833, 836 (Tex.App.-Houston [14th Dist] 2004, pet. ref'd) (quoting *Macias v. State*, 733 S.W.2d 192, 195 (Tex.Crim.App.1987)). Thus, the actions of appellant's supervisors—Loveless and Burns—are irrelevant in determining whether appellant was "in custody" when

he gave his statement, and we focus on the words and actions of Deputy Pleasant.

■ The evidence, when viewed in the light most favorable to the trial court's ruling, reveals that Deputy Pleasant went to the dealership immediately upon finishing his shift with the HCSO. Deputy Pleasant was not involved in initiating the questioning of appellant—when he entered Burns's office, Loveless and Burns were already talking to appellant. Deputy Pleasant testified that appellant voluntarily admitted his involvement in the theft to Loveless and Burns, that he "[a]sked [appellant] if he would provide a statement on his involvement [with] the theft," and that appellant agreed. Deputy Pleasant stated that he and appellant went together to a different office where appellant provided him with the details of the theft, which he then typed into the voluntary statement form and had appellant review and initial. Deputy Pleasant also testified that when asked by someone at Planet Ford what would happen next to appellant, he answered that "if [appellant] walked off, I couldn't do nothing about it, basically I'd have to get a warrant for him."

Deputy Pleasant indicated that appellant's access to the doors of the offices was not blocked, that he was free to leave at any time, and that he did not ask or attempt to leave the room prior to giving his statement. Loveless's testimony corroborates these statements of Deputy Pleasant. Loveless also testified that it was he and Burns who confronted appellant with their knowledge of the thefts. According to this testimony, Deputy Pleasant did not initiate the questioning and never communicated to appellant either his belief in the existence of probable cause to arrest or an intention to detain him. We hold, therefore, that a reasonable person would have felt that he was at liberty to terminate the interrogation and leave. *See Thompson,*

516 U.S. at 112, 116 S.Ct. at 465; *Stansbury,* 511 U.S. at 323, 114 S.Ct. at 1529; *Dowthitt,* 931 S.W.2d at 254–55.

Although appellant argues now that he thought he was under arrest, his testimony at the suppression hearing indicated that, at some point, he realized that he was free to leave prior to giving his statement. Appellant testified that, while he originally did not "have a thought either way" as to whether he could leave, it became apparent to him that he was not free to leave when Deputy Pleasant allegedly accompanied him to the restroom after he gave his statement. However, this alleged incident is irrelevant in determining whether appellant was in custody earlier when he gave his statement to Deputy Pleasant.

Examining all of the circumstances surrounding the taking of appellant's statement, we cannot conclude that appellant's freedom of movement was restrained to the degree associated with a formal arrest. *See Stansbury,* 511 U.S. at 322, 114 S.Ct. at 1528–29. Thus, we uphold the trial court's finding that appellant's statement was not the result of a custodial interrogation, and the protections of Code of Criminal Procedure article 38.22 and *Miranda* do not apply in this case. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 5; *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

■ Appellant also argues that the words in his statement came from Deputy Pleasant and that he initialed them not knowing that he was making a confession, and, thus, he did not initial the statement voluntarily and of his own free will. However, Deputy Pleasant testified that he merely typed the details provided by appellant, that appellant read the statement and initialed it voluntarily, and that he did not make any threats or promises to induce appellant to give or initial the statement. Viewing the evidence in the light most favorable to the trial court's ruling

and recognizing that the trial court was the sole judge of the credibility of the witnesses and the weight to be given to their testimony, we uphold the trial court's finding that appellant made the statement freely and voluntarily. *See Shepherd,* 273 S.W.3d at 684; *St. George,* 237 S.W.3d at 725.

We overrule appellant's first issue.

### Charge Error

In his third issue, appellant argues that the trial court erred in refusing to instruct the jury that a confession alone is insufficient evidence on which to base a conviction.

### A. Background

At the conclusion of evidence, before the trial court read the charge to the jury, appellant made a request for an additional instruction that "a confession standing alone is not sufficient to authorize a conviction for the alleged offense." Appellant further argued that if the jury were to find that appellant's confession was voluntary, "then we come to this point in looking at the evidence [the] only evidence they have is the defendant's confession." The trial court asked, "How is that the facts of the case? How is that the only evidence?" Appellant responded, "Because that is the only evidence that the defendant, if [the jury] believe[s] the statement, did anything wrong. All the other statements just say well, he was there, it was in his office but none of them really—the evidence doesn't really tie up that he did the offense...." The trial court denied appellant's requested instruction.

### B. Standard of Review

■■■ We review jury charge error in a two-step process. *Ngo v. State,* 175 S.W.3d 738, 744 (Tex.Crim.App.2005). First, we determine whether error exists

in the charge. *Id.* If there is error, we then review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.* When the accused has properly objected to the error in the jury charge, reversal is required unless the error was harmless. *Id.* at 743; *see also Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on reh'g) (discussing harm analysis on issues of charge error), *superseded on other grounds by rule as stated in Rodriguez v. State,* 758 S.W.2d 787, 788 (Tex.Crim.App.1988).

Appellant relies on *Reed v. State,* 141 Tex.Crim. 503, 149 S.W.2d 119 (1941) to support his contention that the trial court erred in denying his requested instruction informing the jury that an extra-judicial confession, standing alone, cannot support a conviction. *Reed* states:

The necessity or otherwise for [an instruction that the accused's confession alone is insufficient to support a conviction] turns upon the facts of the particular case. If proof of the commission of the crime depends upon the extra-judicial statement or confession of the accused, it has been held that such a charge is appropriate. If the crime is shown by evidence other than the confession which admits [the] accused's connection with it, such an instruction is not required.

149 S.W.2d at 123.

■■■ The Court of Criminal Appeals has subsequently held that a trial court need not instruct the jury on corroboration of a defendant's extra-judicial confession when the *corpus delicti* is established by other evidence. *Baldree v. State,* 784 S.W.2d 676, 686–87 (Tex.Crim.App.1989). The *corpus delicti* rule requires some corroboration of a harm brought about by the criminal conduct of some person. *Gon-*

*zales v. State,* 190 S.W.3d 125, 130–31 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd) (citing *Gribble v. State,* 808 S.W.2d 65, 70 (Tex.Crim.App.1990)); *see Salazar v. State,* 86 S.W.3d 640, 644 (Tex.Crim.App. 2002). However, the *corpus delicti* rule does not "require any independent evidence that the defendant was the criminal culprit." *Salazar,* 86 S.W.3d at 644. The *corpus delicti* rule is satisfied "if some evidence exists outside of the extra-judicial confession which, considered along or in connection with the confession, shows that the crime actually occurred." *Id.* at 645. The corroborating evidence need not prove the underlying offense conclusively; there simply must be some evidence that renders the commission of the offense more probable than it would be without the evidence. *Gonzales,* 190 S.W.3d at 131 (citing *Cardenas v. State,* 30 S.W.3d 384, 390 (Tex.Crim.App.2000)).

The Penal Code provides that a person commits theft if the person "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2011). Thus, the *corpus delicti* rule requires some evidence that some property was appropriated with the intent to deprive the owner of the property. *See id.; Salazar,* 86 S.W.3d at 644; *Gonzales,* 190 S.W.3d at 130–31. It is does not require independent evidence that appellant was the criminal actor. *See Salazar,* 86 S.W.3d at 644.

## C. Analysis

The State presented the testimony of four witnesses and introduced seven total exhibits. In addition to appellant's statement, the jury heard the testimony of Dowdley, who testified regarding the large amount of cash that finance managers like appellant handle in the course of business, and who also testified that he had overheard a suspicious conversation among some other finance managers indicating that at least one of them was taking money away from the dealership. Loveless, the finance director, testified that he found altered sales contracts in appellant's desk evidencing a scheme to avoid reporting portions of cash payments to the dealership. Those documents were admitted into evidence and explained by the testimony of Lastor, the comptroller. Lastor testified regarding six sales records that reflected that appellant received more cash than he reported on the final bill submitted to the dealership. Finally, Loveless testified that appellant was the only one who would have received the missing funds and who would have been able to make the changes to the contracts.

Thus, the record contained other evidence, outside of appellant's confession, that a theft occurred. Lastor's testimony regarding inconsistencies between the cash received by appellant and the amount he reported and turned over to the dealership show that the dealership's property was misappropriated, and the testimony of Loveless, Lastor, and Dowdley provides some evidence that appellant acted with the intent to deprive the dealership of the property. *See* TEX. PENAL CODE ANN. § 31.03(a); *Salazar,* 86 S.W.3d at 644–45; *Gonzales,* 190 S.W.3d at 130–31. This evidence fulfills the purpose of the *corpus delicti* rule because "[i]t assures that the very crime to which appellant confessed, and for which he was prosecuted, actually happened." *See Salazar,* 86 S.W.3d at 645. Because the *corpus delicti* rule was satisfied by the evidence in this case, the trial court was not required to instruct the jury on corroboration of a defendant's extra-judicial confession. *See Baldree,* 784 S.W.2d at 686–87; *Reed,* 149 S.W.2d at 123. We hold that appellant has shown no

error in the jury charge. *See Ngo,* 175 S.W.3d at 744.

We overrule appellant's third issue.

### Closing Argument

In his second issue, appellant complains that the trial court erred by denying his request for thirty minutes to make a closing argument and, instead, limiting him to fifteen minutes.

### A. Background

Following the trial court's denial of his request for a jury instruction on corroboration of the confession, appellant stated, "I'm going to request of the Court because of the nature of this case and the intricacies how this happened that I be given 30 minutes for argument. I don't think I can cover it all in 15 minutes." The trial court observed that the testimony portion of the trial had lasted less than two days and stated, "So based on the length of testimony, the offense of a state jail felony, I think 15 minutes is more than reasonable." In response to appellant's objection, the trial court also noted that appellant "didn't even touch any of the State's exhibits" and "didn't go into a single page of the documents." Appellant argued, "Still I need to be able to explain it, Judge, when they went into it so I would request because of the nature of the case, the intricacies of the testimony of the witnesses for the State I be allowed 30 minutes." The trial court again informed the parties they would have fifteen minutes per side for closing arguments.

Toward the end of his closing argument, in which he addressed the majority of the evidence presented at trial, appellant stated, "Members of the jury, I have some more things that I want to go over with you but, I'm sorry my time is up." He concluded by reminding the jury of the burden of proof and arguing that the State

had failed to present any evidence that appellant took the money. He then said, "Judge, can I request more time on the record, please?" The trial court denied the request. Appellant never indicated what specific arguments he would have made had he been allowed more time.

### B. Standard of Review

Trial courts have broad discretion in determining the length of arguments during a trial. *Dang v. State,* 154 S.W.3d 616, 619 (Tex.Crim.App.2005) (citing *Hernandez v. State,* 506 S.W.2d 884, 886 (Tex. Crim.App.1974)). The Court of Criminal Appeals has set out several non-exclusive factors to consider in determining the reasonableness of the time limit imposed on closing argument, including: (1) the quantity of the evidence; (2) the duration of the trial; (3) conflicts in the testimony; (4) the seriousness of the offense; (5) the complexity of the case; (6) whether counsel used the time allocated efficiently; and (7) whether counsel set out what issues were not discussed because of the time limitation. *Id.* at 621.

### C. Analysis

This case involved less than six hours of testimony and lasted less than three days. While a state jail felony is a somewhat serious offense, there were not any serious conflicts in the evidence—the State and appellant presented two different versions of events through relatively straightforward testimony. The State presented several documents supporting its allegations, but those documents were not addressed by appellant during the presentation of his case. Counsel was able to address the majority of the evidence presented during the time he was allowed for closing arguments, and he did not set out what issues were not discussed because of the time limitation.

Given the limited information provided by appellant regarding which issues he was not able to discuss and the broad discretion granted to the trial court in determining the length of arguments, we conclude that the trial court did not abuse its discretion in determining that fifteen minutes was an appropriate amount of time for closing arguments. *See id.* at 619; *see, e.g., Arevalo v. State,* 835 S.W.2d 701, 706–07 (Tex.App.-Houston [14th Dist.] 1992, no pet.) (holding fifteen minute time limit reasonable in cocaine possession case); *Decker v. State,* 734 S.W.2d 393, 395 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd) (holding fifteen minute time limit not abuse of discretion in aggravated robbery case with six witnesses).

We overrule appellant's second issue.

## Motion for Instructed Verdict

In his fourth issue, appellant argues that the trial court erred in denying his motion for an instructed verdict of not guilty because there was no evidence that appellant "received any monies or took funds illegally from anyone."

### A. Background

After the State rested, appellant moved for an instructed verdict of not guilty, arguing,

> The allegations in the indictment have not been met by the evidence in this case in that there is insufficient evidence in this case to show that [appellant] did unlawfully, pursuant to one scheme and continuing course of conduct, acquire and otherwise exercise control over property, namely, cash money.
>
> There is some circumstantial stuff but it doesn't amount to a sufficient amount of evidence to allow the jury to receive

this case and to find a judgment on [appellant].

The trial court denied the motion.

### B. Standard of Review

 A challenge to the trial court's ruling on a motion for an instructed verdict is a challenge to the legal sufficiency of the evidence to support the conviction. *Canales v. State,* 98 S.W.3d 690, 693 (Tex. Crim.App.2003). In assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App.2010). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the jury. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim.App. 2000). Every fact does not need to point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim.App.2007). Circumstantial evidence is as probative as direct evidence in establishing guilt and may alone be sufficient to establish guilt. *Id.*

A person commits a theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a). When a defendant is charged with committing multiple thefts over a period of time, the State may choose to aggregate the thefts pursuant to Penal Code section 31.09, which provides:

**462**

When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense.

*Id.* § 31.09 (Vernon 2011).

### C. Analysis

The State presented the testimony of Dowdley and Loveless regarding the discovery of a scheme to siphon cash from car deals. The State presented appellant's account of how he committed the thefts both through his written statement and the testimony of Loveless and Deputy Pleasant. Finally, through Lastor, the State presented six sales records reflecting inconsistencies between the cash received by appellant and what was reported on the final bill submitted to the dealership. Loveless testified that appellant was the only person who would have had access to the cash and the ability to alter the necessary documents.

This evidence was sufficient to show that appellant took cash as part of one scheme or continuing course of conduct with the intent to deprive the owner of the property. *See id.* §§ 31.03, 31.09; *Hooper,* 214 S.W.3d at 13.

We overrule appellant's fourth issue.

### Conclusion

We affirm the judgment of the trial court.